## 15-1763

IN THE

# United States Court of Appeals

## FOR THE FEDERAL CIRCUIT

◆ ◆

BASCOM GLOBAL INTERNET SERVICES, INC.,

*Plaintiff-Appellant,*

—v.—

AT&T MOBILITY LLC AND AT&T CORP.,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
JUDGE BARBARA M.G. LYNN
3:14-CV-03942-M

## BRIEF FOR PLAINTIFF-APPELLANT

ARUN SUBRAMANIAN
SUSMAN GODFREY L.L.P.
560 Lexington Avenue, 15th Floor
New York, New York 10022
(212) 336-8330

DANIEL J. SHIH
SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, Washington 98101
(206) 516-3880

*Attorneys for Plaintiff-Appellant*

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

BASCOM Global Internet  **v.**  AT&T Mobility LLC

Case No.    15-1763

## CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party)

appellant                                certifies the following (use "None" if applicable; use extra sheets if necessary):

1.    The full name of every party or amicus represented by me is:

BASCOM Global Internet Services, Inc.

2.    The name of the real party in interest (Please only include any real party in interest NOT identified in Question 3. below) represented by me is:

None

3.    All parent corporations and any publicly held companies that own 10 percent of the stock of the party or amicus curiae represented by me are listed below. (Please list each party or amicus curiae represented with the parent or publicly held company that owns 10 percent or more so they are distinguished separately.)

None

4.  ☒   The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court (and who have not or will not enter an appearance in this case) are:

SUSMAN GODFREY LLP: Terrell W. Oxford, Jeffrey David

8/18/2015
Date

/s/ Daniel J. Shih
Signature of counsel

Please Note: All questions must be answered

cc:

Daniel J. Shih
Printed name of counsel

Reset Fields

# TABLE OF CONTENTS

I.     INTRODUCTION..........................................................................................1

II.    STATEMENT OF RELATED CASES .......................................................1

III.   JURISDICTIONAL STATEMENT ...........................................................2

IV.    STATEMENT OF THE ISSUES .................................................................2

V.     STATEMENT OF THE CASE ....................................................................2

VI.    STATEMENT OF THE FACTS...................................................................3

VII.   SUMMARY OF THE ARGUMENT...........................................................9

VIII.  ARGUMENT ..............................................................................................11

       A.    Standard of review ............................................................................11

       B.    Framework for determining patent-eligibility ....................................11

       C.    The district court incorrectly found the claims of the '606
             patent to be patent-ineligible...........................................................13

             1.    At step one, the claims of the '606 patent are directed to a
                   patent-eligible concept...........................................................13

             2.    At step two, the claims of the '606 patent recite inventive
                   concepts and therefore are patent-eligible. ..............................22

IX.    CONCLUSION AND STATEMENT OF RELIEF SOUGHT .................30

# TABLE OF AUTHORITIES

**CASES**

*Accenture Global Servs., GmbH v. Guidewire Software, Inc.*,
    728 F.3d 1336 (Fed. Cir. 2013) ........................................ 16

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
    134 S. Ct. 2347 (2014) ................................ 11, 12, 15, 18, 22, 26, 27

*BASCOM Global Internet Servs., Inc. v. AOL Inc., et al.*,
    No. 2:08-cv-1765-LDW-ARL, ECF No. 183 (E.D.N.Y. Nov. 4,
    2011) ...................................................... 9, 28

*BASCOM Global Internet Servs., Inc. v. AT&T Mobility LLC*,
    — F. Supp. 3d —, No. 3:14-CV-3942-M, 2015 WL 2341074
    (N.D. Tex. May 15, 2015) ............................................ 3

*CLS Bank Int'l v. Alice Corp. Pty. Ltd.*,
    717 F.3d 1269 (Fed. Cir. 2013) ........................................13

*Cogent Medicine, Inc. v. Elsevier Inc.*,
    70 F. Supp. 3d 1058 (N.D. Cal. 2014) ................................ 24

*Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A.*,
    776 F.3d 1343 (Fed. Cir. 2014) ...................................... 16

*DDR Holdings, LLC v. Hotels.com, L.P.*,
    773 F.3d 1245 (Fed. Cir. 2014) ............................ 18, 22, 23, 29, 30

*Dealertrack, Inc. v. Huber*,
    674 F.3d 1315 (Fed. Cir. 2012) ...................................... 12

*Diamond v. Diehr*,
    450 U.S. 175 (1981) ................................................ 24

*I/P Engine, Inc. v. AOL Inc.*,
    No. 2013–1307, 576 F. App'x 982 (Fed. Cir. Aug. 15, 2014) ..............17

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
    694 F.3d 51 (Fed. Cir. 2012) ........................................................... 11

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
    132 S. Ct. 1289 (2012) .................................................................... 12

*Research Corp. Techs. v. Microsoft Corp.*,
    627 F.3d 859 (Fed. Cir. 2010) ........................................................ 12

*Scanlan v. Texas A&M Univ.*,
    343 F.3d 533 (5th Cir. 2003) ........................................................... 11

*Ultramercial, Inc. v. Hulu, LLC*,
    722 F.3d 1335 (Fed. Cir. 2013) ....................................................... 15

*Ultramercial, Inc. v. Hulu, LLC*,
    772 F.3d 709 (Fed. Cir. 2014) ............................................ 12, 15, 16

*WildTangent, Inc. v. Ultramercial, LLC*,
    134 S. Ct. 2870 (2014) .................................................................... 15

## STATUTES

28 U.S.C. § 1295 ................................................................................... 2

28 U.S.C. § 1331 ................................................................................... 2

28 U.S.C. § 1338 ................................................................................... 2

35 U.S.C. § 101 ................................................................................... 11

# I.  INTRODUCTION

This appeal seeks reversal of a district court's dismissal of a patent case based on a finding, at the pleadings stage, that the claims of the patent-in-suit are not patent-eligible. The claims deal with specific solutions for filtering Internet content that can be customized to the individual user while avoiding circumvention by technologically savvy users. In order to find the claims "abstract," the district court mischaracterized them as directed generally to "filtering content," overlooking the specific methods and logic required by the claims. The district court also improperly disregarded the inventive concepts present in the claims, relying not just on inapposite evidence but also an erroneous legal standard for what constitutes an inventive concept. As a result, the judgment of the district court should be reversed.

# II. STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5(a), appellant states that there have been no other appeals in this civil action before this or any other appellate court.

Pursuant to Federal Circuit Rule 47.5(b), appellant states that there are no cases known to counsel to be pending in this or any other court that will directly affect or be directly affected by this Court's decision in the pending appeal.

## III.   JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1338(a). This Court has jurisdiction under 28 U.S.C. § 1295(a)(1). The judgment or order appealed from is final.

## IV.   STATEMENT OF THE ISSUES

A single issue is presented for review: Whether the district court erred in finding the claims of the patent-in-suit to be patent-ineligible under the abstract-ideas exception to patentability.

## V. STATEMENT OF THE CASE

Plaintiff-appellant BASCOM Global Internet Services, Inc. ("BASCOM"), filed this action for patent infringement against AT&T Inc. on November 6, 2014. A34–35 (No. 1). BASCOM filed an amended complaint adding as defendants AT&T Mobility LLC and AT&T Corporation (together, "AT&T") on January 14, 2015, then dismissed their parent company AT&T Inc. A40–45; A36 (No. 19).

On January 15, 2015, AT&T moved to dismiss the amended complaint pursuant to Fed. R. Civ. P. 12(b)(6), arguing that the patent-in-suit did not cover patent-eligible subject matter under 35 U.S.C. § 101. A36 (No. 23). On March 26, 2015, the district court held a hearing on AT&T's motion. A38 (No. 35). On May 15, 2015, the district court issued an order granting AT&T's motion. A2; *BASCOM*

*Global Internet Servs., Inc. v. AT&T Mobility LLC*, — F. Supp. 3d —, No. 3:14-CV-3942-M, 2015 WL 2341074 (N.D. Tex. May 15, 2015). The district court entered judgment the same day. A1. This appeal timely followed. A38 (No. 41).

## VI.   STATEMENT OF THE FACTS

The patent-in-suit, U.S. Patent No. 5,987,606 (the '606 patent), issued from an application filed on March 19, 1997, and is titled "Method and system for content filtering information retrieved from an Internet computer network." A47–59. BASCOM, based on Long Island in New York, is the original assignee of the '606 patent, and the inventors are current and former employees of the company. Since its inception in 1996, BASCOM has been in the business of providing Internet content-filtering products and services based on the technology of the '606 patent to schools, libraries, and other institutions.[1]

The '606 patent deals with a problem with conventional Internet technology—namely, the ability of a computer to access any public content on the Internet, without restriction. The patent explains:

> Many entities have found a need to block access to some web sites for certain end-users. For example, corporations may wish to allow their employees to access technical or business sites but not entertainment

---

[1] BASCOM has no relationship whatsoever to Bascom Research, LLC, a party to one of the cases that AT&T relied upon in the district court.

> oriented sites, while families may wish to prevent access to sexually explicit or other objectionable information.

A54 at 1:30–35. As this passage reflects, the inventors recognized that different end-users may have different criteria for what kinds of content should be blocked.

According to the patent, one prior approach to the problem was to implement content-filtering functionality on each client computer. Among the disadvantages of that approach were:

> First, it is subject to be modified or thwarted by a computer literate end-user, such as a teenager or corporate employee. Second, in either the home, school or corporate environment, it is difficult and time consuming to install on every end-user's client machine. Third, this configuration is dependent upon individual end-user hardware and operating systems and requires modified software for different end-user platforms. Finally, the client database [identifying allowed or disallowed sites] must be updated frequently to track changes in the content of various Internet sites. This requires frequent downloads from the Internet or disk updates.

A54 at 2:1–12. Another approach involved placing the same content-filtering functionality on either a local or central server. A54 at 2:13–39. While that approach avoided some of the disadvantages of having that functionality on the client computer, according to the patent, it still "utilize[d] a single set of filtering criteria for all of their controlled-access end-users" and thus "suffer[ed] from the fact that a single set of filtering criteria is not appropriate for all end-users." A54 at 2:21–25, 2:39–45.

The solution disclosed in the '606 patent involves improvements to the ISP server through which client computers, or local networks of client computers, access the Internet.[2] A55 at 3:52–4:4. However, the patent does not simply disclose the use of ISP servers to conduct filtering in a way that had been done previously. Rather, the ISP server described in the patent provides content-filtering functionality that can vary based on which end-user at a client computer is attempting to access the Internet.

The patent's customizable filtering solution is implemented by associating each end-user's "individual controlled access network account" with at least one "filtering scheme" (in essence, code that determines whether to allow access to requested Internet content) and at least one set of "filtering elements" (in essence, data specifying parameters to be applied by the filtering scheme). A55–56 at 3:3–11, 4:66–5:3. The associated filtering scheme code is then executed, and that code applies the associated filtering elements to determine whether a particular request for Internet content should be allowed based on the destination address of the request and other information. A54–56 at 2:66–3:3, 5:3–4, 5:57–64. The patent provides a flowchart showing the programmatic operations associated with this.

---

[2] "ISP" refers to "Internet Service Provider." A54 at 1:9–10.

A49 fig. 3; A51 fig. 5. If the request is not allowed, the ISP server returns a message, such as a web page indicating that the request was denied. A56 at 5:26–30. Certain "privileged" users are provided with the ability to select and modify the filtering schemes and filtering elements to be associated with each individual controlled access network account. A56 at 5:31–43.

The patent also teaches a variety of filtering schemes that might be used. Notably, the patent teaches the use of "a hybrid master inclusive-list combined with personal exclusive and inclusive lists" scheme and provides a flowchart specifying the programmatic operations associated with this scheme. A56 at 5:51–6:10; A50 fig. 6. The scheme allows a user to access Internet sites that are (a) on a master list of allowed sites and not on the list of disallowed sites associated with the user's account or (b) on a list of specifically allowed sites associated with the user's account. A56 at 5:65–6:6; A50 fig. 6. The point of such a multi-level scheme is to allow easier administration of the system than simple, non-hybrid filtering schemes. In this particular hybrid scheme, the master list can provide default rules for the network that may be overridden for categories of user accounts that call for additional restriction (e.g., accounts for children or regular employees) or greater access (e.g., accounts for users assigned to research normally inappropriate topics). This provides flexibility while limiting the amount of repetition necessary among

the various lists, thus constraining the proliferation of customization data as the number of user accounts increases.

The claims of the '606 patent cover different aspects of the disclosed invention. A few of the base claims address the ability of the ISP server to provide individually customizable filtering based on which end-users are attempting to access content. These "**Individually Customizable Filtering**" claims include claims 1, 18, and 24. Claim 1 is instructive:

> 1. A content filtering system for filtering content retrieved from an Internet computer network by individual controlled access network accounts, said filtering system comprising:
>
> a local client computer generating network access requests for said individual controlled access network accounts;
>
> at least one filtering scheme;
>
> a plurality of sets of logical filtering elements; and
>
> a remote ISP server coupled to said client computer and said Internet computer network, said ISP server associating each said network account to at least one filtering scheme and at least one set of filtering elements, said ISP server further receiving said network access requests from said client computer and executing said associated filtering scheme utilizing said associated set of logical filtering elements.

A56–57.

The majority of the '606 patent claims address the ability to provide individually customizable filtering *using particular filtering scheme structures*. The

7

most notable of these are the "**Hybrid Filtering Scheme**" claims—namely, claims 10, 11, 12, 15, 16, 22, and 23. Claim 23 is instructive, and it is set forth below with claim 22 on which it depends:

> 22. An ISP server for filtering content forwarded to controlled access network account generating network access requests at a remote client computer, each network access request including a destination address field, said ISP server comprising:
>
> a master inclusive-list of allowed sites;
>
> a plurality of sets of exclusive-lists of excluded sites, each controlled access network account associated with at least one set of said plurality of exclusive-lists of excluded sites; and
>
> a filtering scheme, said filtering scheme allowing said network access request if said destination address exists on said master inclusive-list but not on said at least one associated exclusive-list, whereby said controlled access accounts may be uniquely associated with one or more sets of excluded sites.
>
> 23. The ISP server of claim 22 further comprising:
>
> a plurality of inclusive-lists of allowed sites, each controlled access user associated with at least one of said plurality of inclusive-lists of allowed sites, said filtering program further allowing said network access request if said requested destination address exists on said at least one associated inclusive-list.

These claims require a filtering scheme incorporating the hybrid, multi-level logic approach previously described.

The '606 patent was the subject of a prior patent infringement lawsuit against AOL Inc. In November 2011, a jury found that AOL had infringed the '606 patent

and also found all of the asserted claims (namely, claims 10, 11, 12, 15, 16, 22, and 23—that is, the Hybrid Filtering Scheme claims) to be *valid*, rejecting AOL's argument that the asserted claims were obvious in light of the prior art. *BASCOM Global Internet Servs., Inc. v. AOL Inc., et al.*, No. 2:08-cv-1765-LDW-ARL, ECF No. 183 (E.D.N.Y. Nov. 4, 2011).

## VII.   SUMMARY OF THE ARGUMENT

The judgment of the district court should be reversed because the district court erred in finding that the claims of the patent-in-suit were directed to an abstract concept and that the claims lacked an inventive concept to make them patent-eligible.

*First*, the claims are not directed to an abstract concept. The district court mischaracterized the claims as directed to "filtering content," an overgeneralization that fails to describe the particular problem or solution addressed by the claims at issue. The claims are not directed to "filtering content" in the abstract, but rather cover specific Internet-content filtering solutions that (1) can be customized for the person attempting to access such content without requiring local servers or computers to provide such functionality and (2) avoid circumvention by technologically savvy users. The district court compounded its error by failing to address each of the claims in the patent-in-suit individually, even though each claim

is different and has distinct elements. Most notably, the Hybrid Filtering Scheme claims cover an even more particular solution including a filtering scheme that utilizes specific logic that is especially effective. These claims were not specifically addressed in the district court's opinion. Such concrete solutions cannot be characterized as abstract, or else virtually every patent would be "ineligible" under § 101.

*Second*, the claims include inventive concepts that ensure that the claims are not just covering the concept of filtering content on the Internet. All of the claims include a specially programmed ISP server with the claimed programming required to select and execute the appropriate filtering scheme and filtering elements based on the network account making the request. The Hybrid Filtering Scheme claims include not only that programming, but also the programming required for a specific hybrid-structure filtering scheme. Such elements, taken as an ordered combination, are certainly not conventional or routine and qualify as inventive concepts making the claims patent-eligible.

The district court in this case went out of its way at the pleadings stage to rule that the patent-in-suit was ineligible, overlooking the particulars of the patent and its claims, in contravention of this Court's law. For these reasons and those set forth below, the judgment of the district court should be reversed.

# VIII.  ARGUMENT

## A.    Standard of review

For issues not unique to patent law, this Court applies the law of the regional circuit where this appeal would otherwise lie, in this case the Fifth Circuit. *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 66 (Fed. Cir. 2012). A district court's dismissal under Fed. R. Civ. P. 12(b)(6) is reviewed *de novo. Scanlan v. Texas A&M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003).

## B.    Framework for determining patent-eligibility

Under 35 U.S.C. § 101, the subject matter eligible for patenting includes "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." The judicially recognized exceptions from this provision are for "[l]aws of nature, natural phenomena, and abstract ideas." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2354 (2014). The rationale behind these exclusions is "one of pre-emption," namely a "concern that patent law not inhibit further discovery by improperly tying up the future use of these building blocks of human ingenuity." *Id.* (quotation marks omitted). However, courts must "tread carefully in construing this exclusionary principle less it swallow all of patent law." *Id.* Thus, "for abstractness to invalidate a claim it *must 'exhibit itself so manifestly* as to override the broad statutory categories of eligible subject matter and

the statutory context that directs primary attention on the patentability criteria of the rest of the Patent Act.'" *Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1333 (Fed. Cir. 2012) (quoting *Research Corp. Techs. v. Microsoft Corp.*, 627 F.3d 859, 868 (Fed. Cir. 2010)) (emphasis added).

The Supreme Court has "set forth a framework for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts." *Alice*, 134 S. Ct. at 2355. *First*, the Court must "determine whether the claims at issue are directed to one of those patent-ineligible concepts." *Id.* "If not, the claims pass muster under § 101." *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 714 (Fed. Cir. 2014). *Second*, if the answer to the first step is "yes," then the Court must "consider the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Alice*, 134 S. Ct. at 2355 (quoting *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1297 (2012)). This step essentially asks whether the claims add an "inventive concept" that is "sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself." *Alice*, 134 S. Ct. at 2355 (quoting *Mayo*, 132 S. Ct. at 1297) (modification marks omitted).

12

An issued patent, such as the patent-in-suit, is entitled to a presumption of validity that applies to §101 challenges, placing a heavy burden on the party alleging that claims are patent-ineligible. *CLS Bank Int'l v. Alice Corp. Pty. Ltd.*, 717 F.3d 1269, 1284 (Fed. Cir. 2013) (Lourie, J., concurring, joined by Dyk, Prost, Reyna, Wallach, JJ.) ("[A]s with obviousness and enablement, that presumption [of validity] applies when §101 is raised as a basis for invalidity in district court proceedings."); *id.* at 1304–05 (Rader, J., concurring-in-part and dissenting-in-part, joined by Linn, Moore, O'Malley, JJ.) ("Because we believe the presumption of validity applies to all challenges to patentability, including those under Section 101 and the exceptions thereto, we find that any attack on an issued patent based on a challenge to the eligibility of the subject matter must be proven by clear and convincing evidence."). As explained below, AT&T failed to meet this burden.

## C. The district court incorrectly found the claims of the '606 patent to be patent-ineligible.

### 1. *At step one, the claims of the '606 patent are directed to a patent-eligible concept.*

The district court erred in concluding that the claims were directed to the abstract concept of "filtering content." The district court's characterization of the claims as directed simply to "filtering content" is inapt for at least three reasons.

*First*, "filtering content" dramatically understates the problem that the claims address. Even the broadest claims—the Individually Customizable Filtering claims—are directed to the more specific problem of providing Internet-content filtering in a manner that can be customized for the person attempting to access such content while avoiding the need for (potentially millions of) local servers or computers to perform such filtering and while being less susceptible to circumvention by the user. Moreover, the Hybrid Filtering Scheme claims address the even more particular problem of structuring a filtering scheme not just to be effective, but also to make user-level customization remain administrable as users are added instead of becoming intractably complex. As a result, the district court's characterization of all of the claims as simply "filtering content" reduces what was actually claimed to an absurdly generalized phrase.

This Court and the Supreme Court have cautioned against evaluating claims at such a stripped-down level of generality. This Court "has long-recognized that any claim can be stripped down, simplified, generalized, or paraphrased to remove all of its concrete limitations, until at its core, something that could be characterized as an abstract idea is revealed. A court cannot go hunting for abstractions by ignoring the concrete, palpable, tangible limitations of the invention the patentee actually claims." *Ultramercial, Inc. v. Hulu, LLC*, 722 F.3d 1335, 1344

(Fed. Cir. 2013), cert. granted, judgment vacated sub nom. *WildTangent, Inc. v. Ultramercial, LLC*, 134 S. Ct. 2870 (2014). Similarly, as the Supreme Court has recognized, "[a]t some level, all inventions embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas. Thus, an invention is *not* rendered ineligible for patent simply because it *involves* an abstract concept." *Alice*, 134 S. Ct. at 2354 (internal quotation and modification marks and citations omitted; emphasis added). In short, the first step of the patent-eligibility framework is not merely an exercise in boiling down a patent's purpose to a high-level statement about its goals, such that nothing fails that step. Rather, as this Court has made clear, the first step is a potential stopping point. *See Ultramercial*, 772 F.3d at 714 ("If [the first step is not satisfied], the claims pass muster under § 101.").

*Second*, the district court gives short shrift to the fact that the claims are concerned with *Internet* content, asserting (without support) that "content provided on the Internet is not fundamentally different from content observed, read, and interacted with through other mediums like books, magazines, television, or movies, all of which have had to grapple with filtering complications similar to those addressed by the claims of the '606 Patent." A20. That is incorrect, at least in the context of the '606 patent, because those other mediums do not have a technological method for filtering content as part of the communications

15

infrastructure.[3] In contrast, the '606 patent claims deal with improvements to the communications technology itself, namely to the ISP servers that enable communication between the client computer and the other computers on the Internet.

This fact makes inapposite the cases that the district court relied upon in which claims were found to be directed to an abstract idea. Those claims did not involve *improvements* to technology such as the computer or networking infrastructure, but rather *applications* of computer and networking technology to automate a human or business process. For example, in *Accenture*, the claims involved the generation of tasks (i.e., a to-do list for human actors to perform) based on rules. *See Accenture Global Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1338–39 (Fed. Cir. 2013); A16. In *Content Extraction*, the claims involved gathering information from paper documents. *See Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A.*, 776 F.3d 1343, 1345 (Fed. Cir. 2014); A18–19. In *Ultramercial*, the claims involved offering free content in exchange for viewing

---

[3] To the extent technological filtering methods are available on some television sets in the form of parental controls, those controls are enforced by client-side equipment and not the television delivery infrastructure. Such controls may be circumvented by a savvy user and do not prevent content that should be inaccessible from being sent to the client-side equipment. The '606 patent claims are concerned with filtering performed by the communications infrastructure itself.

advertisements. *See* 772 F.3d at 712; A17. In *I/P Engine*, the claims involved taking additional information into consideration when selecting search results. *See I/P Engine, Inc. v. AOL Inc.*, No. 2013–1307, 576 F. App'x 982, 984 (Fed. Cir. Aug. 15, 2014); A21–22.[4] All of those cases involved applications potentially running *on* a technology infrastructure, but not technological improvements *to* that infrastructure.

By contrast, the claims of the '606 patent relate to improvements to the technology of the ISP server, a part of the networking infrastructure. Unlike with books, magazines, television, or movies, requests for *Internet* content are made through the same technological communication medium that delivers it. Controlling access to content through improvements to the communication medium itself is a problem unique to the Internet, and that takes the problem of filtering such content out of the realm of abstractness. As this Court noted in *DDR Holdings*, a case in which the Court found claims directed to the creation of a composite web page to be patent-eligible, the claims "stand apart because they do not merely recite the performance of some business practice known from the pre-

---

[4] In *I/P Engine*, the majority opinion did not reach the issue of patent-eligibility, but the issue was discussed in a separate opinion by one judge. *See* 576 F. App'x at 992 (Mayer, J., concurring).

Internet world along with the requirement to perform it on the Internet. Instead, the claimed solution is *necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks*." *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1257 (Fed. Cir. 2014) (emphasis added). Likewise, the Supreme Court has acknowledged that claims that "purport to improve the functioning of the computer itself" or "effect an improvement in any other technology or technical field" are patent-eligible. *Alice*, 134 S. Ct. at 2359. That is exactly the case here: the claims at issue are an improvement to the technology of the communications infrastructure. As a result, the claims are not properly characterized as directed simply to "filtering content," nor can filtering content *on the Internet*—at least in the manner described in the claims—properly be characterized as an abstract idea.

*Third*, while the claims are directed to systems and methods, "filtering content" is neither. The district court asserted that "filtering content [is] a long-standing, *well-known method* of organizing human activity." A16. What "method" the district court is referring to is hard to fathom. To be sure, the *desire* to control the content accessible to certain audiences has been a long-standing one, but if there is some way of doing so that is the supposedly "well-known method," the

district court failed to identify it. Certainly the district court's order identifies no "well-known method" that corresponds to what the claims describe.

The district court did mention three examples of supposed "non-Internet analogs" of filtering content, none of which is actually analogous to the technology of the claims. The district court order mentions:

> Consider as a non-Internet analog parents who meticulously place certain magazines on the coffee table, accessible to their young children, while leaving others on the nightstand or in the closet for adult eyes only. Further, consider a high school English teacher, who must balance the individual maturity of each of her students and the cumbersome prospect of assigning different books to different students, against censoring books for the class as a whole. Finally, consider that movie theaters filter films based on ratings and restrict access based on age.

A23. As a preliminary matter, the existence of supposed "non-Internet analogs" is beside the point because the '606 patent claims address technological improvements to overcome a problem specifically arising in the realm of computer networks, as explained above. None of these examples addresses that problem.

Moreover, the examples cannot be compared meaningfully to the claims. Critically, none of the examples specifies an actual method; each merely describes a problem—a situation or scenario—with no discussion of the supposed steps applied by the parent, teacher, or movie-ticket seller to achieve anything comparable to the claims. Indeed, the first and third examples merely contemplate

one-size-fits-all filtering, not solutions that might be individually customizable. In addition, none of the examples addresses the problem of avoiding circumvention by a technologically savvy person. To be sure, in the district court's analog examples, a snooping child might find materials on the nightstand or in the closet, a curious student might read materials assigned to a friend, and a customer at a multiplex might sneak into another theater. But such circumventions only allow access to the limited set of content in the home, classroom, or theater. None results in the ability to request and obtain anything from an open and interactive universe of content such as on the Internet. In short, the district court's examples do not provide any analog to the solution provided by the '606 patent claims to this problem. Further, none of the examples suggests any solution for filtering to be individually customizable using a filtering scheme with multi-level logic that constrains the proliferation of customization data as more users are included, as the Hybrid Filtering Scheme claims teach.

Finally, the district court's footnote stating that the Telecommunications Act of 1996 supports its conclusion cannot withstand scrutiny. *See* A23 n.6. While the district court's offhand treatment of the Act indicates that the argument did not factor into the district court's decision, the argument was *the sole basis* presented in AT&T's motion in support of the notion that "filtering Internet content" is an

abstract idea. *See* A69–70. The Act clarified that Internet service providers using content filtering technologies (thereby perhaps "editing" the content of the Internet) are not considered "publishers" and thus do not incur liability as publishers of the content they deliver. *See id.* & n.1. AT&T argued that this meant the problem of filtering Internet content was "well-known," A70, which is beside the point because having a well-known *problem* does not make *solutions* to the problem abstract. Indeed, the Act stated a policy of "encourag[ing] the *development* of Internet filtering technologies." A69 (emphasis added). This confirms that filtering solutions are *technology* and that the filtering of Internet content was a sufficiently important problem that further development of novel solutions—such as BASCOM's as claimed in the '606 patent—was to be encouraged. It further confirms that, while the *need* for content filtering may have been known, improved solutions were desired. Nothing in the Act suggests any intent to limit the patent system's role of providing incentives for such technological innovation.

In short, the district court was wrong in its conclusion that the claims may be characterized as directed to "filtering content" and that the claims are directed to an abstract idea.

### 2. At step two, the claims of the '606 patent recite inventive concepts and therefore are patent-eligible.

As explained above, the claims of the '606 patent are not directed to an abstract idea, and the district court's judgment may be reversed on that basis alone. Furthermore, at step two of the patent-eligibility framework, the claims recite inventive concepts, providing another ground for reversal.

In evaluating whether there is an "inventive concept" in a claim, courts must "consider the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Alice*, 134 S. Ct. at 2355. The inquiry looks to the presence of "an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.'" *Id.* (modification in original). An element or combination of elements is not an inventive concept if it "amounts to a mere instruction to 'implement' an abstract idea 'on a computer'" or simply to "apply it." *Id.* at 2358.

In *DDR Holdings*, this Court determined that patent claims relating to "creation of a composite web page" included an inventive concept because they "recite an invention that is *not merely the routine or conventional use of the Internet*." 773 F.3d at 1259 (emphasis added). The Court recognized that the claims "specify

how interactions with the Internet are manipulated to yield a desired result—a result that overrides the routine and conventional sequence of events ordinarily triggered by the click of a hyperlink." *Id.* at 1258. The Court further recognized that the claims "do not attempt to preempt every application of the idea of increasing sales by making two web pages look the same" and instead "recite *a specific way to automate the creation of a composite web page* . . . that incorporates elements from multiple sources in order to solve a problem faced by websites on the Internet." *Id.* at 1259 (emphasis added). This was a sufficiently "inventive concept" to render the claims patent-eligible. *Id.*

The same reasoning applies here. The claims do not merely recite "the routine or conventional use of the Internet" because "the routine and conventional sequence of events ordinarily triggered" by a network access request is the unimpeded fulfillment of the request, without any filtering of inappropriate content. Rather, the claims teach the use of a specially programmed ISP server that can provide such filtering in an individually customizable manner.

Even though such technology is plainly not generic, the district court wrongly decided that the claims lacked an inventive concept based *not* on the "routine or conventional" use of computer or Internet technology but on whether certain elements were *in the prior art*. The '606 patent specification recognizes that

inferior methods of filtering network access requests, which also utilized software, existed in the prior art. The district court improperly took this to mean that *any* claimed filtering software—apparently regardless how inventive or specifically claimed it was—may be disregarded out of hand as an inventive concept. The district court reasoned simply that "[f]iltering software, apparently composed of filtering schemes and filtering elements, was well-known in the prior art." A29; *see also* A31 (disregarding as an inventive concept "'a filtering scheme' that allows a 'network access request' if the web address exists on the 'master inclusive list but not on . . . [the] exclusive list'" (modifications in original)). This reasoning is unsound because it erroneously conflates what was known in the prior art, which goes to anticipation or obviousness, with what is generic, which goes to patent-eligibility. *Diamond v. Diehr*, 450 U.S. 175, 191 (1981) (noting that potential inability to satisfy novelty or nonobviousness requirements "does not affect the determination that respondents' claims recited subject matter which was eligible for patent protection under § 101"); *id.* at 190 ("The question therefore of whether a particular invention is novel is 'wholly apart from whether the invention falls into a category of statutory subject matter.'"); *Cogent Medicine, Inc. v. Elsevier Inc.*, 70 F. Supp. 3d 1058, 1064 n.3 (N.D. Cal. 2014) ("It is important to distinguish novelty and obviousness from the 'inventive feature' inquiry required by the Supreme

24

Court in *Alice*."). The existence of some methods of filtering requests involving software in the prior art says nothing about whether *other* (or *improved*) methods in a patent claim are "routine or conventional." Moreover, given that the district court issued judgment on AT&T's Rule 12(b)(6) motion to dismiss, there is no record supporting such a conclusion.

The improper conflation aside, the district court provided no basis for disregarding the programming of the ISP server as part of the inventive concept of the claims. In fact, such programming does qualify as an "inventive concept" making the claims patent-eligible, especially in the Hybrid Filtering Scheme claims such as claim 23. Those claims include not only the programming required to select and execute the appropriate filtering scheme and filtering elements for each request based on the network account, but also the programming required for a particular (and particularly useful) hybrid-structure filtering scheme. That scheme is specifically claimed as "allowing said network access request if said destination address exists on said master inclusive-list but not on said at least one associated exclusive-list" and "further allowing said network access request if said requested destination address exists on said at least one associated inclusive-list." A58 at 9:6–11, 9:16–18. This multi-level filtering logic is specific and cannot be characterized as mere functional language that leaves unspecified how one achieves the claimed

result. Rather, such logic translates directly into actual computer instructions. Figure 6 of the patent (reproduced below) is instructive: It depicts the particular logical flow specified in claim 23 and similar claims through the highlighted items 253, 254, and 255.



FIG. 6

A50 (highlighting added). Such particularity ensures that these claims are not directed at patenting the concept of filtering content itself, but rather cover a specific (and better) way of solving that problem while using an ISP server that applies individually customizable filtering schemes and filtering elements. *See Alice*,

134 S. Ct. at 2355 (describing inventive concept as "an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself'" (modification in original)). The claims do not merely instruct one to "implement" content filtering on a computer or just "apply it." *See id.* at 2358.

The district court dismissed the significance of this multi-level filtering logic on the ground that "the '606 Patent itself states that it would be obvious to an ordinary artisan that the filtering scheme can be any number of known hybrid schemes." A30. That reasoning makes no sense. As previously explained, what might be "obvious" is not the inquiry. Moreover, there is no basis in the record for asserting that the logic described in claim 23 and similar claims was a "known" scheme. The only support that the district court's order cites is the following sentence in the patent: "However, it will be obvious to one of ordinary skill in the art that the filtering scheme can be any of a number of known-schemes, or hybrids thereof." A30; A55 at 4:27–30. But that does *not* say that the filtering scheme of claim 23 was known. Indeed, that sentence simply reflects that the term "filtering scheme" can include any kind of filtering logic, including hybrids of then-known schemes. It does *not* suggest that it was obvious at the time of the invention to use any *particular* filtering scheme, much less the particular multi-level scheme

specified in Hybrid Filtering Scheme claims in combination with an ISP server that applies individually customizable filtering schemes and filtering elements. To characterize the Hybrid Filtering Scheme claims as "obvious" was an overreach, particularly in the face of a prior jury verdict in the *AOL* case finding that *each* of those claims was *not* obvious. *See BASCOM Global Internet Servs., Inc. v. AOL Inc., et al.*, No. 2:08-cv-1765-LDW-ARL, ECF No. 183 (E.D.N.Y. Nov. 4, 2011). That jury had the benefit of a fully developed evidentiary record, such as on the state-of-the-art at the time of the invention. While that jury finding may not be binding on AT&T in this case, it underscores why the multi-level filtering logic must be presumed—especially on a 12(b)(6) motion to dismiss—to be a significant innovation over the existing art and cannot be characterized as obvious, let alone as conventional.

Although the other claims may not be limited to the particular filtering scheme described in the Hybrid Filtering Scheme claims, they do include the programming that selects and executes the appropriate filtering scheme and filtering elements for each request based on the network account. That itself is an

inventive concept making the claims patent-eligible.[5] According to the claims, the ISP server is specially configured for "associating each said network account to at least one filtering scheme and at least one set of filtering elements, . . . receiving said network access requests from said client computer and executing said associated filtering scheme utilizing said associated set of logical filtering elements." A57 at 7:4–10. Although some of these steps may not be as specific and may not translate as directly into particular computer instructions as the filtering scheme logic of the Hybrid Filtering Scheme claims, they are no less specific than the software steps of the claim found in *DDR Holdings* to be sufficiently inventive—those steps being "receiv[ing]" a signal, "identify[ing]" a web page, "retriev[ing]" data, and "generat[ing] and transmit[ting]" a web page. 773 F.3d at 1249–50.

Such claims are also not so broad as to translate into an attempt to cover the concept of filtering content itself. Certainly they do not cover the prior art methods

---

[5] Although BASCOM believes these other claims are not abstract, it does not intend to assert them as freestanding claims in this case. (The district court decided AT&T's motion before the stipulated date for BASCOM to identify the asserted claims.) Accordingly, if this Court prefers not to reach the patent-eligibility of such claims (i.e., of all claims *other than* the Hybrid Filtering Scheme claims), BASCOM would accept the judgment as to such claims if the district court's patent-eligibility findings on them are vacated.

of implementing content-filtering functionality on each client computer or on a server programmed to utilize only a single set of filtering criteria, nor did AT&T contend below that no other alternatives exist. Rather, the claims are addressed to an ISP server programmed with a specified algorithm for determining which filtering scheme and filtering elements to apply to each request based on the "controlled access network account" making the request before executing that scheme with those elements to determine whether to allow the request. As in *DDR Holdings*, such "claims include 'additional features' that ensure the claims are 'more than a drafting effort designed to monopolize'" the supposedly abstract idea. 773 F.3d at 1259. Thus, even the Individually Customizable Filtering claims include an "inventive concept," making all of the '606 patent's claims patent-eligible.

## IX.    CONCLUSION AND STATEMENT OF RELIEF SOUGHT

For the foregoing reasons, the judgment of the district court should be reversed and the case remanded for trial.

Dated: August 18, 2015.        Respectfully submitted,

ARUN S. SUBRAMANIAN
SUSMAN GODFREY L.L.P.
654 Madison Avenue
New York, New York 10065
(212) 336-8330

DANIEL J. SHIH
SUSMAN GODFREY L.L.P.

1201 Third Avenue, Suite 3800
Seattle, Washington 98101
(206) 516-3861

By ___*/s/ Daniel J. Shih*_____
      Daniel J. Shih

*Attorneys for Plaintiff-Appellant*

# ADDENDUM

# ADDENDUM TABLE OF CONTENTS

| Document | Page No. |
|---|---|
| 5/15/2015    Judgment (Doc. 39) | A1 |
| 5/15/2015    Memorandum Opinion and Order (Doc. 38) | A2–A31 |
| U.S. Patent No. 5,987,606 | A47–A59 |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| BASCOM GLOBAL INTERNET SERVICES, INC., | § § § | |
| Plaintiff, | § § | |
| v. | § § | No. 3:14-cv-3942-M |
| AT&T MOBILITY LLC and AT&T CORP., | § § | |
| Defendants. | § | |

## JUDGMENT

This Judgment is entered pursuant to the Court's May 15, 2015 Memorandum Opinion

and Order [Docket Entry #38] **GRANTING** Defendants' Rule 12(b)(6) Motion to Dismiss and

**DISMISSING** Plaintiff's claims with prejudice.

It is **ORDERED, ADJUDGED,** and **DECREED** that Plaintiff take nothing by its suit

against Defendants and that this suit is hereby **DISMISSED**.

**SO ORDERED.**

May 15, 2015.

**BARBARA M. G. LYNN**
**UNITED STATES DISTRICT JUDGE**
**NORTHERN DISTRICT OF TEXAS**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| BASCOM GLOBAL INTERNET SERVICES, INC., | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | No. 3:14-cv-3942-M |
| AT&T MOBILITY LLC and AT&T CORP., | § | |
| | § | |
| Defendants. | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff BASCOM Global Internet Services, Inc. ("BASCOM") brings this action

against Defendants AT&T Mobility LLC and AT&T Corp. (collectively, "AT&T")[1] for

the alleged infringement of U.S. Patent No. 5,987,606 ("the '606 Patent"), which claims a

method and system for filtering Internet content.  AT&T moves to dismiss BASCOM's

suit under Fed. R. Civ. P. 12(b)(6), arguing that the '606 Patent claims unpatentable

subject matter under 35 U.S.C. § 101.  For the reasons stated herein, AT&T's Motion to

Dismiss [Docket Entry #23] is **GRANTED**.

### BACKGROUND OF THE INVENTION

The patent-in-suit is directed toward a method and system for filtering Internet

content in a manner that is customizable for each Internet user.  '606 Patent at 1:7–11.

Filtering Internet content may be necessary in both the employment and household

settings, as companies may wish to restrict their employees' access to certain websites,

and parents may wish to do the same for their children.  *See id.* at 1:30–35.

---

[1] BASCOM initially sued AT&T Inc. as well, but then dismissed AT&T Inc. on January
15, 2015 [Docket Entry #19].

1

**A2**

According to the "Background of the Invention," initial attempts to filter Internet content were implemented directly on the personal computer ("PC"), which simply stored a database of allowed or disallowed websites ("the single-user configuration"). *Id.* at 1:58–59, Fig. 8. Several problems arose with the single-user configuration, including the prospect that a determined and tech-savvy employee or teenager might thwart or modify the filtering function. *Id.* at 2:1–3. It could also be time-consuming and costly to install a filter on every PC; different PCs may require modified software; and the database that stores the allowed and disallowed websites must be frequently updated with Internet downloads or disk updates to track changes in the content of Internet sites. *Id.* at 2:3–12.

A "local server-based configuration" uses many PCs, with different software platforms, and connects them together through a local area network ("LAN"). *Id.* at 2:13–17. The LAN is connected to the ISP's server through a local server and dial-up or fixed connection. *Id.* at 2:17–19. The local server employs a single set of filtering criteria for all of the users on the LAN. *Id.* at 2:19–23. Although the local server-based configuration is more difficult to tamper with, it still suffers many of the same drawbacks of the single-user configuration, *i.e.*, it requires costly and time-intensive local installation and maintenance, and the filtering software is limited to the LAN or local server. *Id.* at 2:25–35. Also, a single set of filtering criteria may not be appropriate for all users on the LAN. *Id.* at 2:23–25.

Prior to the filing of the '606 Patent, some ISPs used a "server-based configuration" in which the filtering function is performed at the site of the remote server. *Id.* at 2:36–39. However, like the single-user configuration and local server-based configuration, the remote server employs a single set of filtering criteria for all

2

**A3**

users, and as a result, suffers from the same one-size-*does-not*-fit-all complications. *Id.*
at 2:42–45.

## PATENT-IN-SUIT

The '606 Patent claims an invention designed to overcome the disadvantages in
the single-user, local server-based, and server-based configurations by providing
individualized, customizable filtering and data storage on the ISP server. *Id.* at 2:52–55.
The system claimed requires no special software on the PC or LAN, works with any
hardware, operating system, or LAN, allows users to select a variety of filtering schemes
and elements, and remains difficult to tamper with or circumvent. *Id.* at 2:56–65.

In the claimed invention, an ISP server executes or incorporates software with
filtering schemes, and accesses databases to obtain filtering elements required by the
filtering scheme. *Id.* at 2:66–3:3, 7:3–10. The ISP server then matches individual end-
user accounts to the filtering scheme and filtering elements associated with that account,
which may, for example, include an exclusive-list filtering scheme and a database of
restricted websites, or alternatively, a word or phrase screening filter and database of
restricted words or phrases. *Id.* at 3:3–11, 7:3–77, 7:31–34, 7:60–67. The preferred
embodiment of the claimed invention covers an ISP server with end-user databases
holding additional sets of filtering elements to further customize the filtering scheme. *Id.*
at 3:11–15. In the Court's view, Claims 1 and 22 are representative:[2]

---

[2] Claims 1, 14, 18, 22, and 24 are the independent claims of the '606 Patent, and
therefore, are most frequently discussed by the parties. AT&T argues that Claim 1 is
representative for purposes of the patentable subject matter analysis. BASCOM
disagrees, and argues that AT&T has the burden to invalidate each independent and
dependent claim of the '606 Patent. March 26, 2015 Hr'g Tr. at 31:8-11. In its briefing,
Plaintiff presented Claims 1 and 22 as instructive. *Id.* at 18:9-14. The Court finds that,
for the purposes of this § 101 invalidity challenge, Claim 1 is representative of the

**1.** A content filtering system for filtering content retrieved from an Internet computer network by individual controlled access network accounts, said filtering system comprising:

> a local client computer generating network access requests for said individual controlled access network accounts;

> at least one filtering scheme;

> a plurality of sets of logical filtering elements; and

> a remote ISP server coupled to said client computer and said Internet computer network, said ISP server associating each said network account to at least one filtering scheme and at least one set of filtering elements, said ISP server further receiving said network access requests from said client computer and executing said associated filtering scheme utilizing said associated set of logical filtering elements.

**22.** An ISP server for filtering content forwarded to controlled access network account generating network access requests at a remote client computer, each network access request including a destination address field, said ISP server comprising:

> a master inclusive-list of allowed sites;

> a plurality of sets of exclusive-lists of excluded sites, each controlled access network account associated with at least one set of said plurality of exclusive-lists of excluded sites; and

> a filtering scheme, said filtering scheme allowing said network access request if said destination address exists on said master inclusive-list but not on said at least one associated exclusive-list, whereby said controlled access accounts may be uniquely associated with one or more sets of excluded sites.

---

"Individually Customizable Filtering Claims" and Claim 22 is representative of the "Filtering Scheme Structure Claims." Pl. Resp. Br. at 4–5 (describing Claims 1–6, 18, 24 and 25 as the "Individually Customizable Filtering Claims" and Claims 7–17, 19–23 as the "Filtering Scheme Structure Claims"); *see Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*, 776 F.3d 1343, 1348 (Fed. Cir. 2014) (holding that a court need not address each individual claim, and instead may address certain representative claims if all the claims are substantially similar and linked to the same abstract idea).

## LEGAL BACKGROUND

The Patent Act addresses what inventions are patentable:

> Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title. 35 U.S.C. § 101.

The Supreme Court "has long held that this provision contains an important implicit exception . . . 'laws of nature, natural phenomena, and *abstract ideas*' are not patentable." *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1293 (2012) (emphasis added) (quoting *Diamond v. Diehr*, 450 U.S. 175, 185 (1981)). The Court's recent decisions have particularly scrutinized the patentability of computer-implemented abstract ideas. Because AT&T argues the claims in this case are directed toward an abstract idea and computer-implemented, the seminal cases warrant preliminary discussion.

In *Gottschalk v. Benson*, the Supreme Court considered the patentability of a method for programming a general-purpose computer to convert binary-coded decimal (BCD) numerals into pure binary numerals. 409 U.S. 63, 64 (1972). The Court found the method "so abstract and sweeping as to cover both known and unknown uses of the BCD to pure binary conversion." *Id.* at 68. According to the Court, the claimed method lacked any practical application except in connection with a general-purpose computer, which raised concerns that, if the patent were issued, it "would wholly pre-empt the mathematical formula and in practical effect would be a patent on the algorithm itself." *Id.* at 71. Accordingly, the Court held the claimed invention was ineligible for patent protection. *Id.* at 72.

In *Parker v. Flook*, the Court held unpatentable a method for updating alarm limits that claimed a mathematical formula for calculating the updated alarm limit in processes involving the catalytic conversion of hydrocarbons. 437 U.S. 584, 594 (1978). Considering the principles established in *Benson*, the Court noted that the claimed method did not seek to preempt all uses of the mathematical formula, but instead was limited to the oil and petrochemical industry. *Id.* at 589–90. The applicant argued that the invention's "'post-solution' activity—the adjustment of the alarm limit to the figure computed according to the formula—distinguishe[d] th[e] case from *Benson* and ma[de] his process patentable." *Id.* at 590. The Court rejected the argument that the mere application of an abstract principle rendered the invention patentable, and concluded that the claimed method, including the mathematical formula, considered as a whole, contained no patentable invention. *Id.* at 594. The Court found all of the components of the invention were well-known, and the claims only provided a new and better method for calculating alarm limit values, dedicated to a specific purpose. *Id.* at 594–95. The Court cautioned that its decision not be read to preclude patent protection for novel and useful computer programs, especially given that computer technology was in its infancy at the time. *Id.* at 596.

In *Diamond v. Diehr*, the Court addressed the patentability of a process that used a mold to convert raw, synthetic rubber into cured products. 450 U.S. at 177. Because the temperature inside the mold was difficult to accurately measure, the prior art struggled to measure the precise amount of time necessary to cure the rubber. *Id.* at 178. The claimed process involved constantly measuring the temperature inside the mold and feeding those measurements into a computer that repeatedly recalculated the cure time by

6

**A7**

means of the longstanding Arrhenius equation. *Id.* at 178–79. When the recalculated time equaled the actual time that had passed since the press was closed, the computer would send a signal to a device that opened the press. *Id.* at 179. The constant measuring of the temperatures inside the press, the repeated recalculation of the time by a computer, and the sending of a signal to a device to open the press were all new in the art. *Id.*

First, the Court described its holdings in *Benson* and *Flook* as mere applications of the longstanding principle that an abstract idea is not patentable simply because the invention involves a computer. *Id.* at 186. Next, the Court concluded that "Arrhenius' equation is not patentable in isolation, but when a process for curing rubber is devised which incorporates in it a more efficient solution of the equation, that process is at the very least not barred at the threshold by § 101." *Id.* at 189. The Court considered the "claims as a whole," and found that they were directed toward an industrial process, not the mathematical formula itself, and thus were eligible for patent protection under § 101, leaving questions of novelty and obviousness for a later, separate inquiry. *Id.* at 192–93.

The Court again addressed the patentability of abstract ideas in *Bilski v. Kappos*, where the patent applicants claimed a computerized procedure for hedging against price changes in the energy market. 561 U.S. 593, 599 (2010). The Court explained that there is no per se rule that methods of conducting business are unpatentable, but held that the patent application at issue did not claim a patentable "process" under § 101. *Id.* at 609–11. The Court found hedging to be a basic and "fundamental economic practice long prevalent in our system of commerce and taught in any introductory finance class." *Id.* at 611 (quoting *In re Bilski*, 545 F.3d 943, 1013 (Fed. Cir. 2008) (Rader, J., dissenting))

(citations omitted). The concept of hedging, which was described in one of the claims and reduced to a formula in another claim, was held to be an unpatentable abstract idea, like the algorithms at issue in *Benson* and *Flook*. *Id.* at 611. Granting the claims patent protection would preempt the use of hedging in all fields and extend a monopoly to the abstract idea itself. *Id.* at 612. Finally, the Court noted that *Flook* debunked the notion that "limiting an abstract idea to one field of use or adding postsolution components" could make a concept like hedging patentable. *Id.* The fact that the claims were limited to the energy market did not make them eligible for protection. *Id.*

Most recently, in *Alice Corporation Pty. Ltd. v. CLS Bank International et al.*, the Court held that the claims at issue were directed to the abstract idea of intermediated settlement, and that merely requiring implementation of that abstract idea by a generic computer did not transform it into a patent-eligible invention. 134 S. Ct. 2347, 2352 (2014). In *Alice*, the representative method claims were directed toward facilitating the exchange of financial obligations between two parties by using a computer system as a third-party intermediary. *Id.*

Before analyzing the patent-in-suit, the Court explained that its decisions refusing patentability for abstract ideas are rooted in concerns about preemption. *Id.* at 2354. In other words, the Court is concerned that a claim directed toward an abstract idea could preempt that approach in all fields, and effectively create a monopoly over the abstract idea. *Id.* (citing *Bilski*, 561 U.S. at 611–12). However, the Court reiterated that an invention's mere utilization of an abstract idea does not make the invention ineligible for a patent. *Alice*, 134 S. Ct. at 2354 (citation omitted). Patent protection remains available

for abstract ideas that are applied to new and useful ends. *Id.* (citing *Benson*, 409 U.S. at 67).

The Court reintroduced the two-step process for determining the subject-matter eligibility of a patent that incorporates an abstract idea. *Id.* at 2355 (citing *Mayo*, 132 S. Ct. at 1296–98). First, the Court determines whether the patent is directed toward an abstract idea, *i.e.*, "Step One". Second, the Court "considers the elements of each claim both individually and 'as an ordered combination' to determine whether additional elements 'transform the nature of the claim' into a patent-eligible application," *i.e.*, "Step Two." *Alice*, 134 S. Ct. at 2355 (quoting *Mayo*, 132 S. Ct. at 1294). The Second Step is essentially a search for an "inventive concept"—an element or combination of elements that ensures that the practice of the patent amounts to more than a patent upon the abstract idea itself. *Id.*

The Court illustrated Step One by analogizing the patent-in-suit to the invalidated patent in *Bilski*, finding the claimed method of intermediary settlement was also directed toward a fundamental, long prevalent economic practice. *Id.* at 2356 (citing *Bilski*, 561 U.S. at 612).

The Court proceeded to Step Two to determine whether the claims contained an inventive concept sufficient to transform the abstract idea of intermediated settlement into a patent-eligible application. *Id*. at 2357. The Court searched for additional features that might reveal the invention as something more than a "drafting effort designed to monopolize the abstract idea." *Id.* The Court reiterated that an eligible claim cannot recite an abstract idea and merely add the words "apply it." *Id.* (citing *Mayo*, 132 S. Ct. at 1294).

A "patent's recitation of a computer amounts to a mere instruction to 'implemen[t]' an abstract idea 'on . . . a computer,'" and as such, does not confer patent eligibility. *Alice*, 134 S. Ct. at 2358 (quoting *Mayo*, 132 S. Ct. at 1301). Because "computers are ubiquitous, the implementation of an abstract idea through a wholly generic computer is not the type of additional feature that satisfies the Court that the invention is much more than a drafting effort to monopolize the abstract idea itself." *Id.* However, "an abstract idea that is implemented on a computer that also improves an existing technological process may be patent eligible." *Id.*

Having analyzed the representative claim in the intermediary settlement patent, the Court held that its limitations did no more than instruct a practitioner to implement the abstract idea of intermediated settlement on a generic computer. *Id.* at 2359. The Court analyzed the claim elements separately and determined that the function performed by the computer at each step of the process was purely conventional, and the functions were well-understood, routine, and previously known to the industry. *Id.* The Court noted that the method claims did not purport to improve the functioning of the computer itself, nor did they improve any other technology or technical claim. *Id.*

Here, citing *Alice* and other cases, AT&T argues that the claims of the '606 Patent are (1) directed to the abstract idea of filtering Internet content, and (2) the patent lacks any additional feature beyond generic computer elements.

## LEGAL STANDARD

Invalidity under 35 U.S.C. § 101 is a question of law that can be addressed at the pleading stage of litigation. *See Content Extraction*, 776 F.3d at 1346 (affirming the district court's dismissal for failure to state a claim because the claims of the patent-in-suit were

invalid as unpatentable subject matter). As Judge Mayer recently commented, conducting a patentable subject matter analysis early in the litigation can conserve judicial resources and save the parties time and money. *See Ultramercial Inc. v. Hulu, LLC*, 772 F.3d 709, 718–19 (Fed. Cir. 2014) (Mayer, J., concurring).

An issued patent is entitled to a presumption of validity, and a party arguing that a patent claims ineligible subject matter under § 101 must prove as much by clear and convincing evidence.[3] *See Wolf v. Capstone Photography, Inc.*, No. 13-CV-9573, 2014 WL 7639820, at *5 (C.D. Cal. Oct. 28, 2014) (explaining that a "patent claim can be found directed towards patent ineligible subject matter if the *only* plausible reading of the patent must be that there is clear and convincing evidence of ineligibility").

## DISCUSSION

I.    **Step One:  The claims of the '606 Patent are directed toward the abstract idea of filtering Internet content.**

### A. Arguments of the Parties

AT&T argues that the claims are directed to the abstract idea of "filtering content," "filtering Internet content," or "determining who gets to see what," which is a well-known "method of organizing human activity," analogous to hedging and intermediated settlement. Dkt. No. 23 at 6 (citing *Alice*, 134 S. Ct. at 2356); Hr'g Tr. at 6:17-19. AT&T explains that filtering Internet content has a well-known concrete analog that goes back decades, when parents and librarians forbade children from reading certain

---

[3] In *Ultramercial*, Judge Mayer wrote in a concurrence that "no presumption of eligibility should attach when assessing whether claims meet the demands of section 101" because "the PTO has for many years applied an insufficiently rigorous subject matter eligibility standard" that was premised on a misunderstanding of the legislative history of the Patent Act." 772 F.3d at 720. The Federal Circuit has not expressly endorsed that position.

A12

books, like J.D. Salinger's *Catcher in the Rye*. Hr'g Tr. at 6:20-25. In either situation, someone would decide who gets to view certain content. *Id.* at 7:1-4. AT&T argues that filtering content and filtering *Internet* content are in essence the same abstract idea, because there is nothing inventive about the Internet, which is a now-ubiquitous communications system, and ISPs have filtered Internet content since 1997, as the specification of the '606 Patent teaches. Hr'g Tr. at 7:15-20; '606 Patent at 2:36–40.

AT&T also notes that filtering Internet content was so well-known that it was the subject of Congressional action more than a year before the filing of the '606 Patent, when Congress passed the Telecommunications Act of 1996 and explained that United States policy was to encourage "development of technologies which maximize user control over what information is received," and "to remove disincentives for the development and utilization of blocking and filtering technologies that empower parents to restrict their children's access to objectionable and inappropriate online material." Telecommunications Act of 1996, Pub. L. No. 89-110, 110 Stat. 56 (enacted Feb. 8, 1996, codified 47 U.S.C. § 230(b)-(c)) (abolishing liability for ISPs that publish content through filters). The Supreme Court has repeatedly denied patent eligibility to ideas that are "long prevalent" and well-known, and AT&T argues that filtering Internet content is well-known and longstanding within the field of Internet technology. Dkt. No. 23 at 6–7; Hr'g Tr. at 12:9-12.

BASCOM relies on the Federal Circuit's recent decision in *DDR Holdings v. Hotels.com, L.P.* to argue that the claims of the '606 Patent address a problem arising in the realm of computer networks, and provide a solution expressly rooted in computer technology, and therefore are not directed toward an abstract idea. *See DDR Holdings v.*

12

**A13**

*Hotels.com, L.P.*, 773 F.3d 1245, 1257 (Fed. Cir. 2014); *Alice*, 134 S. Ct. at 2359.

BASCOM argues that the recent decisions of the Supreme Court and Federal Circuit

make it clear that claims relating to computer and software technology are directed to an

abstract idea *only if* they are directed toward a longstanding and fundamental practice that

exists independent of computer or Internet technology, and filtering Internet content is

neither longstanding, fundamental, nor independent of the Internet.  Dkt. No. 29 at 13.

BASCOM rejects AT&T's characterization of the claims of the '606 Patent as being

directed toward filtering Internet content, because in doing so, BASCOM argues that

AT&T is merely boiling down the patent's purpose to a high-level statement about its

goals.  Adopting AT&T's approach, BASCOM argues, would mean that even a

mousetrap could be deemed patent ineligible because it is directed towards "catching

mice."[4]  *Id.*

BASCOM also criticizes AT&T's reliance on Judge Mayer's concurrence in *I/P*

*Engine, Inc. v. AOL Inc.*, an unpublished decision, in which Judge Mayer concluded that

claims for content-based and collaborative-based Internet filtering were unpatenable

because they were "merely an Internet iteration of the basic concept of combining content

and collaborative data."  Dkt. No. 28 at 15–16; 576 Fed. App'x 982, 995 (Fed. Cir. Dec.

15, 2014)).  BASCOM claims that Judge Mayer's reasoning is inapplicable to this case

---

[4] The obvious flaw in this analogy is that a mouse trap would pass muster under Step
Two because it adds the inventive concepts of being cheap, relatively clean, and
transportable.  In contrast, notwithstanding any obviousness challenge, a hypothetical
invention that recited a method for catching mice comprising laying cheese on the floor,
observing said cheese at all times, and grabbing the mouse that nibbles on said cheese,
would probably fail Step Two of the *Alice* framework because it fails to add an
"inventive concept" to the abstract idea of catching mice.  In other words, the potential
preemptive scope of the claims would substantially outweigh the invention's contribution
to the field of rodent control.

because AT&T has not identified a non-technological analog to filtering Internet content, and because the claims of the '606 Patent are distinct.[5]

Finally, BASCOM argues that the Telecommunications Act of 1996 actually supports its position because Congress sought to "encourage the development of Internet filtering *technologies*," confirming that Internet filtering is a particular technological field, improved by the claims of the '606 Patent.  Dkt. No. 29 at 17 (citing *Alice*, 134 S. Ct. at 2358).

### B.  Analysis

The Court finds that the claims of the '606 Patent are directed toward the abstract idea of filtering Internet content.

The Court begins by "examin[ing] the claims because claims are the definition of what a patent is intended to cover."  *Ultramercial*, 772 F.3d at 709.  As already discussed, the Court finds Claims 1 and 22 to be representative.  *See supra* note 2.

Claim 1 recites elements for filtering Internet content, including: (1) a local client computer that generates network access requests for individual network accounts; (2) at least one filtering scheme; (3) sets of filtering elements; and (4) a remote ISP server, connected to the client computer, that associates each network account to at least one filtering scheme and filtering elements, and executes the filtering scheme after receiving network access requests from the client computer.  '606 Patent at 6:62–7:10.

---

[5] As AT&T notes in its Reply, many of BASCOM's arguments regarding Step One of the *Alice* analysis, *i.e.*, whether filtering Internet content is an abstract idea, are more properly directed to Step Two of the analysis, *i.e.*, whether the invention sufficiently adds an "inventive concept" to the abstract idea of filtering Internet content.  Therefore, the Court addresses many of these arguments in Step Two.

14

Claim 22 recites elements for an ISP server that filters Internet content, including (1) a list of allowed websites; (2) lists of excluded websites associated with network accounts; and (3) a filtering scheme that allows access to a web address if the address is on the list of allowed websites and on the list of excluded websites. *Id.* at 8:63–9:11.

A review of these claims makes it clear that the invention of the '606 Patent is directed toward the abstract idea of filtering content, a long-standing, well-known method of organizing human activity. *See Alice*, 134 S. Ct. at 2356; *Bilski*, 561 U.S. at 609; *DDR Holdings*, 773 F.3d at 1257; *Ultramercial*, 772 F.3d at 715; *Accenture Global Services, GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1344–45 (Fed. Cir. 2013); *Content Extraction*, 776 F.3d at 1347.

In *Accenture*, the Federal Circuit considered the validity of a patent claiming "a computer program . . . for handling insurance-related tasks," with software components for "generating and organizing insurance-related tasks." 728 F.3d at 1338. The system claims covered storing insurance information in a database, and when an event occurred, the system determined what tasks were necessary to accomplish the relevant transaction, and assigned those tasks to individuals. *Id.* The system included databases, a component to access the databases, a server, and an event processor. *Id.*

The Federal Circuit examined the system claims, which the district court held were directed to the abstract idea of "organizing data rather than to specific devices or systems." *Id.* at 1344. On appeal, Accenture argued that the specification demonstrated that the patent was an advance in computer software, and did not simply claim an abstract idea. *Id.* However, the Federal Circuit found that the claims at issue were directed toward the abstract idea of "generating tasks [based on] rules . . . to be completed upon the

A16

occurrence of an event." *Id.* at 1344 (citation omitted). The court proceeded to Step Two, and found only "generalized software components arranged to implement an abstract concept on a computer," which were insufficient to confer patentable subject matter eligibility. *Id.* at 1344–35.

In *Ultramercial*, decided after *Accenture* and *Alice*, the Federal Circuit analyzed claims directed to a method for distributing copyrighted media products over the Internet, by which an advertiser would pay for a customer to receive a copyrighted media product without charge, in exchange for the customer viewing an advertisement. 772 F.3d at 712. The plaintiff argued that the claims were directed to a method of advertising and content distribution that had never before deployed on the Internet, and thus were not directed toward an abstract idea. *Id.* at 714. The Federal Circuit disagreed, and found that the ordered combination of steps set forth in the claims recited an "abstraction—an idea, having no particular concrete or tangible form." *Id.* at 715. Although certain elements of the relevant claims added a degree of particularity, the concept embodied by most of the limitations only revealed the "abstract idea of showing an advertisement before delivering free content." *Id.* The court acknowledged that all inventions rest upon an abstract idea at some level, and clarified that not all software-based patents will necessarily be directed toward an abstract idea; however, the court found that the claims at issue were directed toward the abstract idea of using advertising as currency, and the addition of novel and non-routine components to that idea did not make the idea more concrete. *Id.*

In *DDR Holdings*, the Federal Circuit held that claims covering "systems and methods of generating a composite web page that combines certain visual elements of a

'host' website with content of a third-party merchant" passed muster under § 101. 773 F.3d at 1248. The composite web page prevented third-party merchants from luring visitor traffic away from a host website, and did so by creating a new web page that permitted a visitor to "practically be in two places in the same time." *Id.* Rather than being whisked away to a merchant's website, the visitor is navigated to a composite web page that displays product information from the third-party merchant while maintaining the host website's "look and feel." *Id.*

The *DDR Holdings* court explained that, in some instances, "patent-ineligible abstract ideas are plainly identifiable and divisible from the generic computer limitations recited by the remainder of the claim." *Id.* at 1256. Although some claims may recite "various computer hardware elements," such claims will not be patent eligible if "directed at nothing more than performance of an abstract business practice on the Internet or using a conventional computer." *Id.* The court noted that the "asserted claims [did] not recite a mathematical algorithm," nor "[did] they recite a fundamental economic or longstanding commercial practice." *Id.* at 1257. Although the claims *did* "address a business challenge (retaining website visitors), [that] challenge [was] particular to the Internet." *Id.* The court acknowledged that identifying the precise nature of the abstract idea was more difficult than in *Alice* and its progeny, as evidenced by the defendant's various characterizations of the abstract idea and the dissent's alternative characterization. *Id.*

Applying any of the characterizations, the Federal Circuit found that Step Two of the *Alice* framework was met, because the claims did "not merely recite the performance of some business practice known from the pre-Internet world along with the requirement

17

to perform it on the Internet," but instead, "the claimed solution [was] necessarily rooted in computer technology to overcome a problem specifically arising in the realm of computer networks." *Id.* Importantly, the court noted that its decision in *Ultramercial* demonstrated that "not all claims purporting to address Internet-centric challenges are eligible for patent," but found the claims at issue were distinguishable because they "[did] not broadly and generically claim 'use of the Internet' to perform an abstract business practice (with insignificant added activity)," and the claims "specif[ied] how interactions with the Internet are manipulated to yield a desired result . . . that overrides the routine and conventional sequence of events ordinarily triggered by the click of a hyperlink." *Id.* at 1258. In other words, "the limitations of the . . . asserted claims . . . taken together as an ordered combination . . . recite[d] an invention that [was] not merely the routine or conventional use of the Internet." *Id.* at 1259.

Finally, in *Content Extraction*, the Federal Circuit considered claims reciting a "method of 1) extracting data from hard copy documents using an automated digitizing unit such as a scanner, 2) recognizing specific information form the extracted data, and 3) storing that information in a memory," which could be carried out by software on an ATM that "recognizes information on a scanned check, such as the check's amount, and populates certain data fields with that information in a computer's memory." 776 F.3d at 1345. In conducting Step One of the *Alice* framework, the court acknowledged that the "Supreme Court has not 'delimit[ed] the precise contours of the 'abstract ideas' category.'" *Id.* at 1347 (quoting *Alice*, 134 S. Ct. at 2357). The Federal Circuit noted that there is no categorical business-method exception, but explained that "claims directed to the mere formation and manipulation of economic relations may involve an

18

abstract idea," such as "claims directed to the performance of certain financial transactions." *Id.* (citing *Alice*, 134 S. Ct. at 2356–57; *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1355 (Fed. Cir. 2014); *Accenture*, 728 F.3d at 1338).  Applying the foregoing rules to the claims before it, the court agreed with the district court that the claims were directed toward "data collection, recognition, and storage," an "indisputably well-known [concept]" that humans have always performed, and banks have performed for some time.  *Id.* at 1347.  The court rejected the plaintiff's argument that its claims were distinct from those in *Alice* and other cases because they required a computer *and* scanner, and "human minds are unable to process and recognize the stream of bits output by a scanner," by noting that the claims in *Alice* also included computers that processed bit streams.  *Id.* (citing *Alice*, 134 S. Ct. at 2358).

Turning to this case, a review of Claims 1 and 22 make it clear that they are directed toward the abstract idea of filtering content.  *See* '606 Patent at 6:62–63 ("A content filtering system for filtering content retrieved from an Internet computer network . . . ."), 8:63 ("An ISP server for filtering content . . . .").  Although the claims clearly apply to *Internet* content, content provided on the Internet is not fundamentally different from content observed, read, and interacted with through other mediums like books, magazines, television, or movies, all of which have had to grapple with filtering complications similar to those addressed by the claims of the '606 Patent.

Although BASCOM relies heavily on the Federal Circuit's decision in *DDR Holdings*, it should be noted that the Federal Circuit did not decide in *DDR Holdings* whether the composite web page at issue was directed toward an abstract idea.  *See DDR Holdings,* 773 F.3d at 1257.  The court observed that the invention did not recite a

19

mathematical algorithm, nor did it recite a fundamental or longstanding commercial

practice, and to the extent it addressed a business challenge, that challenge was particular

to the Internet. *Id.* The court then explained that any characterization of the abstract idea

underlying the claims would satisfy Step Two. *Id.* Furthermore, to the extent the *DDR*

*Holdings* court analyzed whether the subject claims were directed toward an abstract

idea, it did so by exclusion, finding the claims did not fall squarely within the categories

of business methods or mathematical formulas previously analyzed by the Supreme Court

and Federal Circuit. *Id.* However, as the Federal Circuit noted shortly after its decision

in *DDR Holdings*, such categories of abstract ideas are not firmly established. *Content*

*Extraction*, 776 F.3d at 1347. Filtering content, or "determining who gets to see what," is

an abstract idea because it is a longstanding method of organizing human activity, and

BASCOM's application of the idea to the Internet does not, absent an inventive concept,

make that idea more concrete. *See Ultramercial*, 772 F.3d at 716–17 ("[The Internet] is a

ubiquitous information-transmitting medium, not a novel machine."). The Internet

application of filtering content merely allows a person of ordinary skill to filter content at

a greater scale. *See* Hr'g Tr. at 10:10-12; *see also Ultramercial*, 772 F.3d at 716 ("[U]se

of the Internet does not transform an otherwise abstract idea into patent-eligible subject

matter.").

Finally, despite BASCOM's effort to distinguish and minimize Judge Mayer's

concurrence in *I/P Engine*, that concurrence is quite relevant to this case and this Court

finds it highly persuasive. I/P Engine brought claims against AOL, Google, and other

companies for infringement of patents directed to a method for filtering Internet search

results that "utilize[d] both content-based and collaborative filtering." 576 Fed. App'x at

983–84. Content-based filtering determines relevance by extracting features such as text from an information item, while collaborative-based filtering determines relevance by analyzing feedback from other users with similar interests or needs. *Id.* The Federal Circuit held the claims were invalid as obvious; however, Judge Mayer *sua sponte* raised the issue of patentable subject matter in his concurrence. *Id.* at 992. Judge Mayer concluded that the claims asserted by I/P Engine did not disclose new technology, but rather merely recited the use of a generic computer to implement "a well-known and widely practiced technique for organizing information," and therefore fell outside the ambit of § 101. *Id.* Judge Mayer noted that "if claims are drawn to the applications of principles outside the scientific realm—such as principles related to commercial or social interaction—no amount of specificity can save them from patent ineligibility." *Id.* The claims at issue, in Judge Mayer's view, did not "improve the functioning of the computer itself," nor "effect an improvement in any other technology or field." *Id.* at 995 (citing *Alice*, 134 S. Ct. at 2359).

Judge Mayer found that the claims "simply describe[d] the well-known and widely applied concept that it is helpful to have both content-based and collaborative information about a specific area of interest." *Id.* As an illustration, he posited a person planning a visit to London, who might consult a guidebook that would provide information about specific museums in London (content data), as well as gather advice from other people about their impressions of these museums (collaborative data). *Id.* Thus, according to Judge Mayer, I/P Engine's claimed system was nothing more than an Internet, computer-implemented iteration of the basic concept of combining content and collaborative data. *Id.* Finally, Judge Mayer noted that the scope of the claimed

21

invention was "staggering" because it would potentially cover a significant portion of all online advertising.  *Id.*  Thus, in Judge Mayer's view, the vast reach of the claims was disproportionate to their "minimal technological disclosure."  *Id.*

Similar to the claims at issue in *I/T*, the representative claims of the '606 Patent are no more than an Internet iteration of the basic concept of filtering content.  Consider as a non-Internet analog parents who meticulously place certain magazines on the coffee table, accessible to their young children, while leaving others on the nightstand or in the closet for adult eyes only.  Further, consider a high school English teacher, who must balance the individual maturity of each of her students and the cumbersome prospect of assigning different books to different students, against censoring books for the class as a whole.  Finally, consider that movie theaters filter films based on ratings and restrict access based on age.  The Court can conceive of multiple non-Internet analogs to the claims of the '606 Patent, and, as did Judge Mayer in *I/T*, the Court finds that the claims of the '606 Patent are, indeed, directed toward the abstract idea of filtering content, a well-known method of organizing human activity.[6]  *See Alice*, 134 S. Ct. at 2356–57; *compare I/T Engine*, 576 Fed. App'x at 994–95, *with DDR Holdings*, 773 F.3d at 1258 (explaining that the composite web page addresses "a problem that does not arise in the 'brick and mortar' context . . . .").

---

[6] The Telecommunications Act of 1996 supports the Court's conclusion that the claims of the '606 Patent are directed toward the abstract idea of filtering content.  The statute stated that the policy of the United States was "to remove disincentives for the development and utilization of blocking and filtering technologies . . . ."  Telecommunications Act of 1996, PL 104–104, February 8, 1996, 110 Stat 56.  That is, Congress merely sought to incentivize the application of *content filtering* to online material.

II.  **Step Two:  The recited claims fail to recite an "inventive concept" that transforms the abstract idea of filtering Internet content into a patent-eligible invention.**

    A.  **Arguments of the Parties**

        AT&T argues that the claims contain no additional limitations that can supply an inventive concept, and thus fail Step Two of the *Alice* framework.  Specifically, AT&T argues that the claims do no more than recite routine and conventional activities performed by generic computer components, which the Supreme Court and Federal Circuit have expressly foreclosed as means of supplying an inventive concept to an abstract idea.

        AT&T identifies each of the elements in Claim 1—(1) local client computer, (2) filtering scheme, (3) filtering elements, and a (4) remote ISP server.  '606 Patent at 6:62–7:10.  According to AT&T, the local client computer and ISP server are merely generic computers performing generic activities, and the specification shows they were known in the prior art.  *See id.* at 1:58–67, 2:62–64, 4:14–15, 4:1–4.  AT&T also contends that the filtering scheme is "any type of code" and the filtering elements are just "database entries," *i.e.*, generic software to implement the abstract idea of filtering Internet content.  Dkt. No. 23 at 2 (citing '606 Patent at 4:15, 3:1–8).  AT&T argues that *Alice* and *Accenture* have made it clear that an inventive concept cannot be supplied by the mere arrangement of generalized software components to implement an abstract idea on a computer.  *See Accenture*, 728 F.3d at 1345; *Alice*, 134 S. Ct. at 2358.

        Furthermore, AT&T contends that Claim 1 cannot be patent eligible after *Alice* because it merely recites a "filtering scheme utilizing logical filtering elements" and instructs a practitioner to "execute it," and in *Alice*, the Supreme Court clarified that

simply seizing on an abstract idea and instructing one to "apply it" does not transform the idea into an eligible invention.  *See Alice*, 134 S. Ct. at 2358.

Finally, addressing the preemption concerns that undergird Step Two, AT&T notes that Claim 1 could potentially preempt using a single filtering scheme for all network accounts because the claim recites "at least one filtering scheme."  Hr'g Tr. at 18:15-22 (citing '606 Patent at 7:1–10).

AT&T makes many of the same arguments with respect to Claim 22, which recites elements for a content-filtering ISP server, including (1) a master-inclusive list, (2) exclusive-lists of excluded sites, and (3) a filtering scheme.  '606 Patent at 8:63–7:11. Again, AT&T contends that the specification of the '606 Patent teaches that these elements were well-known and are generic.  *Id.* at 1:44–50 (describing in the "Background of the Invention" the availability of exclusive filtering and inclusive filtering in the prior art).  AT&T rejects BASCOM's attempt to characterize hybridized filtering schemes as inventive, noting that the specification states that "it will be obvious to one of ordinary skill in the art that the filtering scheme can be any of a number of known-schemes, *or hybrids thereof.*"  *Id.* at 4:27–30 (emphasis added).

BASCOM argues that AT&T fails to look at the ordered combination of elements, and instead merely picks out individual elements and challenges them as non-inventive. Pl. Resp. Br. at 20; Hr'g Tr. at 36:12-16.  According to BASCOM, the '606 Patent is an advance over prior art because it provides content-filter functionality that can vary based on which end-user at a client computer is attempting to access the Internet, which is implemented by associating each end-user's individual controlled access network account with at least one filtering scheme and at least one set of filtering elements, *i.e.,* code that

24

determines whether to allow access to the requested Internet content. *See* '606 Patent at

3:3–11; 4:66–5:3. In short, BASCOM argues that the inventive concept is the special ISP

server that receives requests for Internet content, which the ISP server then associates

with a particular user and a particular filtering scheme and elements. Hr'g Tr. at 35:12-

22. Further, BASCOM contends that other claims, such as dependent Claim 23 and

independent Claim 24, have more specific inventive concepts. *Id.* at 35:23-36:5. Finally,

BASCOM cautions the Court not to overly impute into § 101 considerations reserved for

invalidity challenges under § 102, § 103, or § 112. *See Cogent Medicine, Inc. v. Elsevier,*

*Inc.*, No. C-13-4470-RMW, No. C-13-4483, No. C-13-4486, 2014 WL 4966326, at *3

(N.D. Cal. Sept. 30, 2014).

### B. Analysis

The Court finds that AT&T has met its burden of showing that the claims of the

'606 Patent fail to recite inventive features that warrant patent protection. The first

inquiry is whether the Federal Circuit's holding and reasoning in *DDR Holdings* means

BASCOM's claims are rooted in the Internet and overcome a problem specifically arising

in the realm of the Internet. *See also Trading Technologies Int'l, Inc. v. CQG, Inc.,* No.

05-CV-4811, 2015 WL 774655, at *5 (N.D. Ill. Feb. 24, 2015) (finding that the claims,

like those at issue in *DDR Holdings*, were "necessarily rooted in computer technology in

order to overcome a problem arising in the realm of computers").

The Federal Circuit expressly stated in *DDR Holdings* that "not all claims

purporting to address Internet-centric challenges are eligible for patents." 773 F.3d at

1258. To illustrate the point, the court discussed its decision in *Ultramercial*, in which it

held that the claims at issue were ineligible for patent protection because they did no

more than recite the abstract idea of "offering media content in exchange for viewing an advertisement" coupled with "routine additional steps such as updating an activity log, requiring a request from the consumer to view the ad, restrictions on public access, and use of the Internet." *Id.* at 1265. Therefore, the issue is whether the claims of the '606 Patent are more analogous to those upheld in *DDR Holdings* or those invalidated in *Ultramercial*.

In *DDR Holdings*, the court found the claims at issue stood apart because "they [did] not merely recite the performance of some business practice known from the pre-Internet world along with the requirement to perform it on the Internet," but rather "the claimed solution [was] necessarily rooted in computer technology to overcome a problem specifically arising in the realm of computer networks." *Id.* In particular, the claims addressed the problem of retaining website visitors that, if adhering to the routine, conventional functioning of Internet hyperlink protocol, would be instantly transported away from a host's website after clicking on an advertisement and activating a hyperlink. *Id.*

The majority rejected the dissent's argument that the "store within a store" concept, such as a "warehouse store that contains a kiosk for selling a third-party partner's cruise vacation packages," was the pre-Internet analog of the asserted claims. *Id.* at 1258. While the concept may have been well-known by the relevant timeframe, the court found that the near-instantaneous transport between web pages made possible by the Internet is a problem that is absent in the "brick and mortar" context. *Id.* The court stated that it was the "challenge of retaining control over the attention of the customer in the context of the Internet" that the patent's claim addressed. *Id.*

*DDR Holdings* distinguished the claims in *Ultramercial* as "broadly and generically claim[ing] 'use of the Internet' to perform an abstract business practice" with insignificant added activity. *Id.* In contrast, the *DDR Holdings* court noted the claims before it specified "how interactions with the Internet are manipulated to yield a desired result that overrides the routine and conventional sequence of events ordinarily instigated by the click of a hyperlink." *Id.* The court held that the limitations of the claims, taken together as an ordered combination, recited an invention that "was not merely the routine or conventional use of the Internet." *Id.* at 1259. The court was also convinced that the claims posed no preemption threat because they contained additional features—a way to "create a composite web page by an outsource provider that incorporates elements from multiple sources to solve a problem faced by websites"—that ensured the claims were more than a veiled attempt to monopolize an abstract idea. *Id.*

Here, the Court looks at the "elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements [beyond those that recite the abstract idea of filtering content] 'transform the nature of the claim' into a patent-eligible application." *Alice*, 134 S. Ct. at 2355 (citing *Mayo*, 132 S. Ct. at 1298). There can be little dispute that the featured elements of Claim 1—"local client computer," "remote ISP server," and "Internet computer network," are well-known, generic computer components. *See* '606 Patent at 1:58–59, 2:36–39, Fig. 8. The specification of the '606 Patent confirms as much. *See id.* Furthermore, the '606 Patent's specification teaches that filtering schemes are merely "any type of code which may be executed." *See id.* at 4:14–15. Filtering elements are described as database entries, such as a list of prohibited websites. *See id.* at 3:1–8; *see Accenture*, 728 F.3d at

27

**A28**

1345 (explaining that a database of tasks did not limit the abstract concept in any meaningful way). None of these elements transform the claims of the '606 Patent into a patent-eligible invention.

Additionally, considered in combination, the local client computer generates network access requests that are sent to the remote ISP server, which executes the filtering software. *Id.* at 6:65–7:10 Filtering software, apparently composed of filtering schemes and filtering elements, was well-known in the prior art. *See id.* at 1:58–59, 2:36–39 ("Initial attempts at Internet content control implemented the filter function on the local (client) machine . . . . [a]dditionally, some service providers . . . have used a third 'server-based' configuration where the filtering function is performed at the remote server site."); *id.* at 1:44–48 (explaining that the "filtering schemes" recited were known in the prior art).

BASCOM argues that the claims contain the limitation of filtering content by utilizing a specialized *ISP server*. AT&T replies that this is merely an attempt to claim the configuration of the network, and in any event, claiming a network is not inventive. *See, e.g.*, *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1355 (Fed. Cir. 2014) (explaining that "send[ing] the information—with no further specification—is not even arguably inventive"). The Court finds that the '606 Patent teaches that using ISP servers to filter content was well-known to practitioners. *See* '606 Patent at 2:36–39 (explaining that some ISPs, like America Online, perform the filtering function at a remote server site). Thus, the ISP server cannot supply the necessary inventive concept absent additional features that reveal the ISP server as more than an attempt to claim the network. Those features are nowhere to be found in the claims of the '606 Patent.

28

**A29**

AT&T notes that the elements of the claims lack structure because they do not recite the structure or programming of the filtering scheme, to which BASCOM responds that is "beside the point," because the claims allow for different filtering schemes for different users. *See* Dkt. No. 29 at 19. However, the absence of structure for the generic computer elements of the claims raises the likelihood that such claims could preempt every filtering scheme under the sun, including a single filtering scheme for all network accounts. *See* '606 Patent at 7:4–9.

Nor are "controlled access network accounts" or the "customizable" features of the claims sufficiently inventive. Individual filtering on the Internet was a recognized need, and the recitation of "controlled access network accounts" in many of the claims is synonymous with a generic computer. *See id.* at 1:30-31 ("Many entities have found a need to block access to some web sites for certain end-users."), 1:44–48 ("Several mechanisms for filtering are available: exclusive filtering . . . inclusive filtering . . . and word-screening or phrase-screening . . . ."), 7:4–6 ("a remote ISP server coupled to *said client computer* and said Internet computer network, said ISP server associating each *said network account* to at least one filtering scheme . . . . (emphasis added)); *see OpenTV, Inc. v. Netflix, Inc.*, 2014 WL 7185921, at *7 (D. Del. Dec. 16, 2014) (finding that claims directed toward "the abstract idea of attempting to provide as much appropriately-selected content to users as possible" were without limitations to make them patent eligible). Moreover, to the extent BASCOM appears to suggest that the hybridized filtering schemes supply an inventive concept, the '606 Patent itself states that it would be obvious to an ordinary artisan that the filtering scheme can be any number of known hybrid schemes. *See* '606 Patent at 4:27–30.

29

**A30**

The individual elements and ordered combination of elements in Claim 22 similarly recite generic computer components, and lack an inventive concept. *See id.* at 9:1–12 (reciting a "master-inclusive list of allowed sites," "exclusive-lists of excluded sites" associated with each "controlled access network account," and "a filtering scheme" that allows a "network access request" if the web address exists on the "master inclusive list but not on . . . [the] exclusive list").

The Court finds that the claims of the '606 Patent, considered individually, or as an ordered combination, are no more than routine additional steps involving generic computer components and the Internet, which interact in well-known ways to accomplish the abstract idea of filtering Internet content. *See Ultramercial*, 772 F.3d at 1265.

## CONCLUSION

The Court finds that, under the two-step *Alice* framework, the claims of the '606 Patent are directed toward the abstract idea of filtering content on the Internet, and the claims do not recite a sufficiently inventive concept to make them much more than an attempt to monopolize the abstract idea itself. Therefore, the Court **GRANTS** Defendants' Motion to Dismiss under Rule 12(b)(6), and **DISMISSES** Plaintiff's claims with prejudice. The Court will enter a separate judgment dismissing the case.

**SO ORDERED**.

May 15, 2015.

**BARBARA M. G. LYNN**
**UNITED STATES DISTRICT JUDGE**
**NORTHERN DISTRICT OF TEXAS**

30

A31

# United States Patent [19]

**Cirasole et al.**

US005987606A

[11] **Patent Number:** 5,987,606

[45] **Date of Patent:** Nov. 16, 1999

[54] **METHOD AND SYSTEM FOR CONTENT FILTERING INFORMATION RETRIEVED FROM AN INTERNET COMPUTER NETWORK**

[75] Inventors: **Peter Cirasole**, Babylon; **Robert DeRosa**, Smithtown, both of N.Y.; **Robert Fox**, Danbury, Conn.

[73] Assignee: **Bascom Global Internet Services, Inc.**, Farmingdale, N.Y.

[21] Appl. No.: **08/820,955**

[22] Filed: **Mar. 19, 1997**

[51] Int. Cl.[6] ........................................ **H04L 9/00**
[52] U.S. Cl. ......................... **713/200**; 713/201; 713/202
[58] Field of Search ........................... 395/186, 187.01, 395/188.01, 200.59, 200.33, 200.49, 200.58; 713/200, 201, 202

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,673,322 | 9/1997 | Pepe et al. | 380/49 |
| 5,706,507 | 1/1998 | Schloss . | |
| 5,732,216 | 3/1998 | Logan | 395/200.33 |

### OTHER PUBLICATIONS

*Internet Censorship: The Top Shelf,* The Economist, May 18, 1996, at 84.
*Surfwatch Filtering Products from Spyglass* (visited Oct. 7, 1996) <htt://www.surfwatch.com/products/surfwatch/datasheet.html>.

*Spyglass Server Application Development Interface* (visited Oct. 7, 1996) <http://www.spyglass/techspec/specs/adi_spec.html>.
*SurfWatch ProServer from Spyglass* (visited Oct. 7, 1996) <http://www.spyglass.com/products/proserver/>.
*Trove Investment—News Page* (visited Oct. 7, 1996) <http://www.netnanny.com/netnanny/nnfaq.html>.
*Trove Investment Corporation—Net Nanny Product Page* (visited Oct. 7, 1996) <http://www.netnanny.com/netnanny/product.html>.
*CYBERsitter Product Information* (visited Oct. 7, 1996) <http://www.solidoak.com/cysitter.htm>.
*Spyglass: Case Studies* (visited Oct. 7, 1996) <http://www.spyglass.com/cases/index.html>.

*Primary Examiner*—Ly V. Hua
*Attorney, Agent, or Firm*—Andrew F. Strobert; Skadden, Arps, Slate, Meagher & Flom LLP

[57] **ABSTRACT**

A method and system for filtering Internet content retrieved from an Internet computer network (**110**) by a remote Internet Service Provider ("ISP") server (**100**) and forwarded to a local client computer (**10**). The method and system matches at least one filtering scheme (**110**), such as an inclusive or exclusive filter, and at least one set of filtering elements (**120**), such as a list of allowed or excluded sites, to each Internet access request generated at the local client computer (**10**). The filtering scheme is implemented on the ISP server (**100**).

**25 Claims, 6 Drawing Sheets**





FIG. 1

FIG. 2



FIG. 3



FIG. 4

FIG. 6

Case 3:13-cv-03842-JSC Document 7-19 Filed 08/14/15 Page 74 of 85 PageID 61



FIG. 5

**A51**



FIG. 7



FIG. 8

FIG. 9

5,987,606

**1**

## METHOD AND SYSTEM FOR CONTENT FILTERING INFORMATION RETRIEVED FROM AN INTERNET COMPUTER NETWORK

### FIELD OF THE INVENTION

This invention relates generally to a method and system for filtering Internet content, and more particularly to a method and system for allowing an Internet Service Provider ("ISP") to perform user-customizable content filtering of information retrieved from the Internet.

### BACKGROUND OF THE PRESENT INVENTION

The Internet contains a wealth of information for consumers, students and businesses. Users generally access this information through software known as a "browser," such as the Netscape Navigator™ or the Microsoft Explorer™. Browsers allow an end-user to access "web sites," which contain content typically in the form of HTML files. The browser software interprets the HTML data and provides the user with graphical images, textual data, audio sound or other forms of output. Other software utilities for accessing Internet content include News Groups, FTPs, IRC chat rooms and e-mail. Additionally, other traditional programs, such as games and database or spread-sheet programs, may also be programmed to directly access Internet content.

Many entities have found a need to block access to some web sites for certain end-users. For example, corporations may wish to allow their employees to access technical or business sites but not entertainment oriented sites, while families may wish to prevent access to sexually explicit or other objectionable information. Indeed, even advocates of free and open speech on the Internet have recognized the need for technology which allows for individualized self-censorship of the content of information received as a means to avoid government censorship of the content which is posted on the Internet.

Software developers have attempted to allow some control over the content of information received on end-user machines ("clients") by filtering the information available. Several mechanisms for filtering are available: exclusive filtering ("black-listing") which prevents access to all sites on a predetermined list of Internet sites; inclusive filtering ("white-listing") which allows access only to a predetermined list of Internet sites; and word-screening or phrase-screening which prevents access to web site "pages" which contain any word or phrase on a predetermined list. Other methods of filtering include blocking access to "newsgroups"—open discussion areas that allow users to easily interact and post content. Another filtering method is the Platform for Internet Content Selection (PICS) standard which allows individual Internet content providers to self-label their content according to standard criteria. PICS also allows for third party labeling of sites.

Initial attempts at Internet content control implemented the filter function on the local (client) machine. FIG. **8** shows a typical prior art configuration, implementing inclusive or exclusive filtering where the client personal computer **500** stores a database **501** of allowed (inclusive) or disallowed (exclusive) Internet sites. Client **500** is connected through an asynchronous dial-up line **502** to the Internet Service Provider ("ISP") server **503**. The ISP server **503** is typically connected via a high speed connection **504** such as a T-1, T-3 or greater, to the global Internet 505. There are several

**2**

disadvantages with this single-user configuration. First, it is subject to be modified or thwarted by a computer literate end-user, such as a teenager or corporate employee. Second, in either the home, school or corporate environment, it is difficult and time consuming to install on every end-user's client machine. Third, this configuration is dependent upon individual end-user hardware and operating systems and requires modified software for different end-user platforms. Finally, the client database **501** must be updated frequently to track changes in the content of various Internet sites. This requires frequent downloads from the Internet or disk updates.

A variation of the single-user configuration of FIG. **8** is shown in FIG. **9**. In this local server-based configuration, a plurality of client computers **520**, running any of a number of platforms such as Windows™, MacOS™ or Unix,™ are coupled to a local area network **521**. The local area network **521** is connected to the ISP server **523** through a local server **522** and a dial-up or fixed connection **524**. End-user requests for Internet content are filtered by the local server **522**. The local server **522** accesses its stored database **525** and utilizes a single set of filtering criteria for all of the end-users of the client computers **520**. This is disadvantageous because a single set of filtering criteria is often not appropriate for all of the end-users. While this local server configuration makes it far more difficult for a computer literate end-user to modify or thwart the system, it suffers from many of the disadvantages of the single-user configuration in that it requires time-consuming local service to initiate and maintain the system on the local server **522**. Many organizations do not have the resources and expertise to install and maintain such a system. Further, while this configuration can often be used with a variety of end-user platforms, software implementing the filtering functions is typically tied to a single local area network or a local server platform.

Additionally, some service providers, such as America Online, have used a third "server-based" configuration where the filtering function is performed at the remote server site. To the inventors' knowledge, however, each of the existing systems implementing this server-based configuration utilize a single set of filtering criteria for all of their controlled-access end-users. Thus, while this system solves some of the problems associated with the local server configuration above, it still suffers from the fact that a single set of filtering criteria is not appropriate for all end-users. Accordingly, there exists a need for a remote ISP server based method and system for filtering Internet content received by controlled access subscribers on an individually customizable basis.

### SUMMARY OF THE INVENTION

The object of the present invention is to overcome these and other disadvantages of the prior art systems by providing individual end-user customizable access control filtering and data storage on the ISP server. These objectives include providing an Internet access system which: requires no special or proprietary software to be installed at the user's site, such as on an end-user (client) computer or a local server; will work with any user hardware or operating system platform or local-area networks; allows users to select filtering schemes, such as inclusive or exclusive filtering, and filtering elements, such as ISP provided inclusive-lists or exclusive-lists, or their own customized inclusive-lists or exclusive-lists; and is difficult to tamper with or circumvent.

The method and system of the present invention includes an ISP server which executes or interprets software incor-

5,987,606

3

porating one or more filtering schemes and accesses databases including any filtering elements required by the filtering scheme. Individual end-user accounts are matched by the ISP server to the filtering scheme and the individualized set of database filtering elements associated with the end-user account. For example, a controlled access end-user account may be matched to an exclusive-list filtering scheme and a database of restricted sites. Alternatively, the controlled access end-user account may be matched to word-screening or phrase-screening filter and a database of restricted words or phrases and context rules. In a preferred embodiment of the present invention, the ISP server further includes end-user databases containing additional sets of filtering elements for further customizing the filtering scheme. While the ISP server preferably accesses the filtering schemes and filtering elements directly from main memory or local storage, the filtering schemes and filtering elements may, alternatively, be located remotely on other servers, or ISP servers, and be accessed through the Internet or a separate computer network connecting the ISP server to the data.

## BRIEF DESCRIPTION OF THE DRAWINGS

For a more complete understanding of the present invention, reference is made to the following Detailed Description taken in connection with the accompanying drawings in which:

FIG. 1 is single-user configuration embodying the present invention;

FIG. 2 is a multiple-user local area network based configuration embodying the present invention;

FIG. 3 is a flow diagram showing the ISP server's process for processing an Internet log-in request;

FIG. 4 is a flow diagram showing the Internet access process for a controlled access subscriber;

FIG. 5 is a flow diagram showing the ISP server's process for servicing an Internet access request;

FIG. 6 is a flow diagram showing a preferred filtering scheme of the present invention;

FIG. 7 shows a distributed implementation of the present invention in which filtering schemes and filtering elements may be distributed across a network;

FIG. 8 shows a prior art single-user configuration; and

FIG. 9 shows a prior art local area network configuration.

## DETAILED DESCRIPTION

Preferred embodiments of the present invention will now be described with continued reference to the drawings.

FIGS. 1 and 2 show single-user and multiple-user local area network configurations, respectively, embodying the present invention. In the single-user configuration, local client 10 is connected to the ISP server 100. The connection 20 is typically a dial-up asynchronous telephone line, but may be any of a number of known means, such as a cable connection or a continuous direct connection.

In the multiple-user local area network a plurality of clients, shown as 11, 12 and 13 on FIG. 2, are coupled to a local server 15 through local area network 16. The clients, 11, 12 and 13 as shown, may be using any of a number of platforms such as the Windows™, MacOS™, or Unix™ operating systems. The clients communicate with the ISP server 100 through local server 15 and connection 20. In this embodiment, connection 20 is preferred to be a continuous direct connection.

4

The ISP server 100 typically provides a plurality of end-users, or subscribers, with access to the Internet 110. The ISP server 100 is coupled to the Internet 110, preferably through a high speed connection 101, such as a T-3 line. Communications across the Internet 110 and ISP servers is through the Transmission Control Protocol/Internet Protocol (TCP/IP). Preferably, the clients, 10 on FIGS. 1 and 11, 12 and 13 on FIG. 2, also communicate with ISP server 100 using the TCP/IP protocol, although other proprietary or public protocols may be supported.

The ISP server 100 typically includes at least one filter scheme 121, stored in main memory or other storage, and a database 120 of a plurality of sets of filtering elements associated with individual end-users. The filtering scheme may consist of any type of code which may be "executed," including object codes, interpreted code, such as Java™ or JavaScript™, other high-level code, or combinations thereof. The filtering scheme may be customized by combining portions of other filtering schemes, such as through a high-level language or visual editor.

The embodiment described below utilizes a single filtering scheme shown in FIG. 6 and sets of filtering elements consisting of a master inclusive-list and a personal inclusive-list and a personal exclusive-list. Accordingly, in the embodiment described, each controlled access end-user will be associated with a set of filtering elements comprising a master inclusive-list and a personal inclusive-list and a personal exclusive-list. However, it will be obvious to one of ordinary skill in the art that the filtering scheme can be any of a number of known-schemes, or hybrids thereof. The types of sets of filter elements will also be different depending on the filtering scheme. Thus, when using a word-screening type filtering scheme, the sets of filtering elements may consist of master lists of disallowed words or phrases together with individual words, phrases or rules.

FIG. 3 shows the ISP server 100 process for accepting a log-in request 200, the ISP server 100 first verifies 201 whether the user is a registered subscriber. Invalid users are sent a rejection notice 202. The ISP server 100 then determines 203 whether the end-user is a controlled access subscriber. If not, the connection is marked 204 as an open access connection. If the end-user is a controlled access subscriber, the log-in process identifies the filtering scheme 205 and the filtering elements 206 associated with the end-user. The connection is marked 207 as a controlled access connection. The ISP server 100 may utilize a single filtering scheme for all controlled access users, in which case, individualized customization is achieved solely through the individualization allowed by modifying the filtering elements.

FIGS. 4 and 5 show the flow of the Internet access process which is executed when a logged-in subscriber sends a request to the ISP server 100 for Internet access.

The Internet access request process begins when an end-user at a client computer (25 in FIG. 4) sends a request to the ISP server 100 for a web page or other Internet service, such as an FTP request. Typically, these requests are sent from the client 25 by an end-user utilizing a browser. In the preferred embodiment, the request is in the TCP/IP format.

As seen in FIG. 5, ISP server 100 receives an Internet access request 220 from client 25. ISP server 100 determines 221 whether this request is from a controlled access subscriber or an open access subscriber. If the request is from an open access subscriber, the request is processed 222 and forwarded to the Internet 110 in the traditional manner.

If the Internet access request is from a controlled access subscriber, the ISP server 100 implements 223 the filtering

5,987,606

**5**

scheme associated with the end-user utilizing the customized filtering elements also associated with the user from the ISP database **120**. The ISP server **100** determines **224** whether the filtering scheme authorizes the request. If the request is authorized, it is processed **222** and forwarded to the Internet, if not, the ISP server **100** provides the end-user with a rejection notice **225**.

For certain filtering schemes, such as wordscreening or phrase-screening schemes, the end-user Internet access request may be partially processed while the ISP server **100** monitors the content for certain words or phrases. The ISP server **100** maintains a table of logged-in end-users associated with this type of filtering scheme. Internet access requests for such end-users are forwarded directly to the Internet **110**. The ISP server **100** then monitors all data packets to determine which will be forwarded to users on this table. If a packet is being sent to such a user, the ISP server **100** screens the packet based on the specific filtering scheme and filtering elements. For certain schemes or elements, multiple data packets may have to be buffered. If the data packet or packets trigger the filtering scheme, such as by containing specific words or phrases, the transmission to the user may be terminated. The sending site may be put on a list of excluded sites used in a hybrid exclusive-list word-parsing scheme.

In the preferred embodiment, the ISP server **100** provides a user-friendly HTML message denying the Internet access request when appropriate. This message may contain a statement of a client corporation's "acceptable use policy" if the end-user subscriber is associated with a corporation.

The preferred embodiment further includes a privileged class of controlled access users. These privileged users are typically parents, in the case of family accounts; teachers, for educational accounts; and corporation administrators, for corporate accounts. The privileged users are responsible for selecting the filtering scheme and filtering elements which are associated with controlled access end-user accounts under the privileged user's control. The filtering scheme may be selected from a fixed set of options, or may be further customized by allowing the privileged user to select and combine elements, such as through a graphical user interface from a number of existing filtering schemes.

When a request by a privileged user is denied, the user receives a special denial message which allows the privileged user to override the denial. Alternatively, the privileged user is allowed to modify the filtering schemes and filtering elements (such as exclusive-list sites) associated with the privileged user and controlled-access end-users controlled by the privileged user.

FIG. **6** shows a preferred ISP server filtering scheme comprising a hybrid master inclusive-list combined with personal exclusive and inclusive lists. ISP server **100** receives **250** Internet access requests and determines **251** whether the end-user is a controlled access subscriber. If not, the request is forwarded to the Internet **110** and processed **252**. If the request is from a controlled access subscriber, the ISP server **100** parses the request **257** and determines **253** whether the requested site is on a master inclusive-list of allowed sites. In the TCP/IP protocol, each Internet access request or "packet" includes the address of the destination computer from which content is requested. Thus, the parsing routine simply examines this destination address and compares it to the address list. The master inclusive-list may be supplied by the ISP or third-party list suppliers. If the site is on the master inclusive-list, the ISP server then checks **254** the site against the subscriber's personal exclusive-list.

**6**

Alternatively, if the site is not on the master inclusive-list, it is checked **255** against the subscriber's personal inclusive-list. If the site is either (i) on the master inclusive—list and not on the personal exclusive-list; or (ii) on the personal inclusive-list, the request is processed **252** and forwarded to the Internet. If not, the request is denied **256** with an HTML message as noted above. The set of filtering elements associated with each end-user account for this preferred embodiment therefore comprise the master inclusive-list and the personal exclusive-list and personal inclusive-list. Any of those lists, as well as any of the other sets of filtering elements described herein, may be optionally set to be empty lists or sets.

FIG. **7** shows a distributed implementation of the present invention. Local client **310** may access ISP server **300** through a dial-up, or other connection **20**. Alternatively, clients may be connected through a local server as shown in FIG. **2**. ISP server **300** is coupled to the Internet **110** through a high-speed connection **101**. The filtering scheme **321** and sets of filtering elements **320** are stored locally to another server **304** either in main memory or secondary storage such as disk storage on the line. Alternatively, the filtering scheme **321** and filtering elements **320** may be stored on separate servers, such as **300**, **304** or **301**. Server **304** may be coupled through a connection **305** to the Internet **110** thereby allowing ISP server **300** to access server **304** through an Internet connection. Alternatively, ISP server **300** and server **304** may be coupled directly or through a separate computer network (not shown). ISP server **300** simply queries server **304** for the user's status as a controlled access user and the user's filtering scheme and set of filtering elements, if any. Alternatively, ISP server **300** may forward the local client **310** Internet access requests to server **304** for processing. This distributed architecture allows an end-user, who might normally use local client **325** to dial-up server **304**, to access the Internet **110** through different local clients, **310** and **311** as shown on FIG. **7**, and Internet points-of-presence, such as through ISP server **300** and **301** as shown in FIG. **7**, provided by the Internet Service Provider, while maintaining the user's customized content filtering. Thus, for example, corporation users could use the same ISP while traveling away from the office.

It is understood that various other modifications will be apparent to and can be readily made by those skilled in the art without departing from the scope and spirit of the present invention. For instance, the filtering scheme may be based on any of a plurality of filtering techniques, such as phrase and content filtering or PICS type filtering and consist of any of various types of "programs," such as executable code, interpreted code, script languages, or other high level programs. Additionally, many combinations of such filters are possible. Similarly, the present invention may be applied equally for various types of communications hardware such as ISDN or cable modems and utilize various types of distributed processing across a computer network, such as the Internet itself. Accordingly, it is not intended that the scope of the claims be limited to the description or illustrations set forth herein, but rather that the claims be construed as encompassing all features of patentable novelty that reside in the present invention, including all features that would be treated as equivalents by those skilled in the art.

What is claimed is:

1. A content filtering system for filtering content retrieved from an Internet computer network by individual controlled access network accounts, said filtering system comprising:

a local client computer generating network access requests for said individual controlled access network accounts;

5,987,606

**7**

at least one filtering scheme;

a plurality of sets of logical filtering elements; and

a remote ISP server coupled to said client computer and said Internet computer network, said ISP server associating each said network account to at least one filtering scheme and at least one set of filtering elements, said ISP server further receiving said network access requests from said client computer and executing said associated filtering scheme utilizing said associated set of logical filtering elements.

**2**. The content filtering system of claim **1** further comprising privileged network accounts, said ISP server allowing said privileged network accounts to modify the set of logical filtering elements matched to said controlled access network accounts.

**3**. The content filtering system of claim **1** further comprising a local server coupled to said local client through a local area network, said remote ISP server being coupled to said local server through a telephonic connection.

**4**. The content filtering system of claim **1** further comprising a second ISP server coupled to said remote ISP server, said matched set of logical filtering elements being stored locally to said second ISP server.

**5**. The content filtering system of claim **4**, wherein said second ISP server is coupled to said remote ISP server through Internet computer network.

**6**. The content filtering system of claim **1** wherein said network access request contains a destination address, said at least one filtering scheme monitoring said destination address of said network access request.

**7**. The content filtering system of claim **6**, wherein said at least one filtering scheme comprises an exclusive-list scheme and said plurality of sets of logical filtering elements comprise lists of excluded Internet sites.

**8**. The content filtering system of claim **6**, wherein said at least one filtering scheme comprises an inclusive-list scheme and said plurality of sets of logical filtering elements comprise lists of allowed Internet sites.

**9**. The content filtering system of claim **6** further comprising a master set of logical filtering elements comprising a list of excluded sites, said at least one filtering scheme comprising a hybrid exclusive-list inclusive-list scheme, said plurality of logical sets of filtering elements comprising lists of allowed sites, each controlled access network account being associated with at least one list of allowed sites.

**10**. The content filtering system of claim **9**, wherein said hybrid filtering scheme excludes Internet access requests to Internet sites listed on said master list of excluded sites unless said Internet site is listed on said associated list of allowed sites.

**11**. The content filtering system of claim **9** further comprising a plurality of lists of excluded sites, each controlled access network account being associated with at least one list of said plurality of lists of excluded sites, said hybrid filtering scheme excluding Internet access requests to Internet sites on said master list of excluded sites or said associated list of excluded sites, unless said Internet site is listed on said associated list of allowed sites.

**12**. The content filtering system of claim **11**, wherein said at least one filtering scheme comprises a word-parsing scheme and said plurality of sets of logical filtering elements comprise lists of excluded words, said word-parsing scheme monitoring the content of data packets being forwarded to the controlled access network account for occurrences of words on the list of excluded words associated with said controlled access network account.

**8**

**13**. The content filtering system of claim **1**, wherein said at least one filtering scheme monitors the data being forwarded to said remote client computer.

**14**. A content filtering system for filtering content retrieved from an Internet computer network by individual controlled access network accounts, said system comprising:

a local client computer generating network access requests for said individual controlled access network accounts;

at least one master site list;

a plurality of first personal site lists, each controlled access network account being associated with at least one first personal site list; and

a remote ISP server coupled to said client computer and said Internet computer network, said ISP server receiving said screening said network access requests based on said master site list and said associated first personal site list.

**15**. The content filtering system of claim **14** further comprising a plurality of second personal site lists, each controlled access network account being associated with at least one second personal site list, said ISP server screening said network access requests based on said master site list and said associated first personal site list and said associated second personal site list.

**16**. The content filtering system of claim **15**, wherein said network access requests comprise a destination address field, said ISP server denying said network access request if said network access request destination address is listed on said associated first personal site list, said ISP server further denying said network access request if said network access request destination address is listed on said master site list and not on said associated second personal site list.

**17**. The content filtering system of claim **14** further comprising a second ISP server coupled to said remote ISP server, said plurality of first personal site lists and said plurality of second personal site lists being stored locally to said second ISP server.

**18**. An ISP server for filtering content forwarded to controlled access network accounts accessing an Internet computer network from a remote client computer, said remote client computer generating network access requests containing a destination address, said ISP server comprising:

a plurality of sets of logical filtering elements, each controlled access network account being associated with at least one set of said plurality of sets of logical filtering elements; and

at least one filtering scheme associated with each controlled access network account, said associated filtering scheme for determining whether to allow said network access request based on said at least one logical set of logical filtering elements.

**19**. The ISP server of claim **18**, wherein said at least one filtering scheme monitors said destination address of said network access requests.

**20**. The ISP server of claim **18**, wherein said at least one filtering scheme monitors the data being forwarded to said remote client computer.

**21**. The ISP server of claim **20**, wherein said at least one filtering scheme comprises a word-parsing scheme, said logical filtering elements comprising words.

**22**. An ISP server for filtering content forwarded to controlled access network account generating network access requests at a remote client computer, each network access request including a destination address field, said ISP server comprising:

5,987,606

9

a master inclusive-list of allowed sites;

a plurality of sets of exclusive-lists of excluded sites, each controlled access network account associated with at least one set of said plurality of exclusive-lists of excluded sites; and

a filtering scheme, said filtering scheme allowing said network access request if said destination address exists on said master inclusive-list but not on said at least one associated exclusive-list, whereby said controlled access accounts may be uniquely associated with one or more sets of excluded sites.

23. The ISP server of claim 22 further comprising:

a plurality of inclusive-lists of allowed sites, each controlled access user associated with at least one of said plurality of inclusive-lists of allowed sites, said filtering program further allowing said network access request if said requested destination address exists on said at least one associated inclusive-list.

24. A method for filtering content retrieved from an Internet computer network by a controlled access account, said method comprising the steps of:

transmitting a network access request associated with said controlled access account from a local client computer;

10

receiving said network access request at a remote ISP server;

associating said network access request with a set of logical filtering elements from a plurality of sets of logical filtering elements stored remotely from said local client;

executing a filtering scheme on said ISP server, said filtering scheme utilizing said associated set of logical filtering elements; and

transmitting said network access request from said ISP server to said Internet computer network if said filtering scheme accepts said network access request and transmitting a rejection from said ISP server to said client computer if said filtering scheme denies said network access request.

25. The method for filtering content retrieved from an Internet computer network of claim 24 further comprising the step of associating said network access request with a filtering scheme from a plurality of filtering schemes stored remotely form said local client.

*   *   *   *   *

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.   : 5,987,606                                   Page 1 of 1
DATED         : November 16, 1999
INVENTOR(S) : Cirasole et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Column 8,
Line 16, delete "said screening" and replace with -- and screening --.

Signed and Sealed this

Twenty-fifth Day of April, 2006

JON W. DUDAS
*Director of the United States Patent and Trademark Office*

Form 30

**FORM 30. Certificate of Service**

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

# CERTIFICATE OF SERVICE

I certify that I served a copy on counsel of record on
by:

8/18/2015

☐ US mail
☐ Fax
☐ Hand
☒ Electronic Means
   (by email or CM/ECF)

Daniel J. Shih

/s/ Daniel J. Shih

Name of Counsel                    Signature of Counsel

Law Firm    Susman Godfrey L.L.P.

Address    1201 Third Avenue, Suite 3800

City, State, ZIP    Seattle, WA 98101

Telephone Number    206-516-3880

FAX Number    206-516-3883

E-mail Address    dshih@susmangodfrey.com

NOTE: For attorneys filing documents electronically, the name of the filer
under whose log-in and password a document is submitted must be preceded
by an "/s/" and typed in the space where the signature would otherwise appear.
Graphic and other electronic signatures are discouraged.

FORM 19. Certificate of Compliance With Rule 32(a)

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.   This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) or Federal Rule of Appellate Procedure 28.1(e).

☒ The brief contains   [*state the number of*] 6,539   words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii), or

☐ The brief uses a monospaced typeface and contains   [*state the number of*] ☐ lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.   This brief complies with the or typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) or Federal Rule of Appellate Procedure 28.1(e) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

☒ The brief has been prepared in a proportionally spaced typeface using

[*state name and version of word processing program* ] Microsoft Word 2010   in

[*state font size and name of type style* ] 14 point, Equity Text B   , or

☐ The brief has been prepared in a monospaced typeface using

[*state name and version of word processing program* ] ☐ with

[*state number of characters per inch and name of type style*] ☐ .

/s/ Daniel J. Shih
_____
(Signature of Attorney)

Daniel J. Shih
_____
(Name of Attorney)

Counsel for Appellant
_____
(State whether representing appellant, appellee, etc.)

8/18/2015
_____
(Date)

Reset Fields